1999-NMCA-112

988 P.2d 317

**Bonnie VARBEL, Worker–Appellant,**

v.

**SANDIA AUTO ELECTRIC and CNA Insurance Company, Employer/Insurer–Appellees.**

No. 19,673.

Court of Appeals of New Mexico.

July 9, 1999.

Certiorari Denied, No. 25,877, Aug. 17, 1999.

**8**

Robert L. Scott, Attorney at Law, P.C., Albuquerque, for worker-appellant.

Phyllis Savage Lynn, Yenson, Lynn & Allen, P.C., Albuquerque, for employer/insurer-appellees.

## OPINION

BUSTAMANTE, Judge.

{1} Bonnie Varbel (Varbel) appeals the Compensation Order terminating her temporary total disability benefits (TTD benefits). The Workers' Compensation Judge (WCJ) terminated her TTD benefits on the ground that Varbel failed to report to her employer, Sandia Auto Electric (Sandia), that she had returned to work. The WCJ concluded that her failure to report was a fraudulent omission that allowed her to continue receiving TTD benefits. Because there is insufficient evidence in the record to support a finding of fraud on Varbel's part, we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

{2} Varbel began receiving TTD benefits after she injured herself in a work-related accident in 1994. The relationship between the parties over the issue of benefits has been contentious. In late 1994 Sandia sought termination of Varbel's TTD benefits for her alleged non-compliance with health care treatment. The parties settled that dispute by agreeing to a mediator's recommended resolution. In 1997 Varbel filed a complaint against Sandia alleging that Sandia wrongfully withheld TTD benefits and seeking payment of back TTD benefits. The crux of that dispute was whether Varbel's physician's recommendation that Varbel have surgery meant that she was no longer at maximum medical improvement (MMI) and thus eligible for TTD benefits, or whether Varbel remained at MMI until the time of the surgery. A secondary issue was to whom the nearly one-year delay between the physician's recommendation and the actual performance of surgery was attributable. The WCJ concluded Varbel was temporarily totally disabled from the date of the physician's recommendation until the time of the surgery and therefore entitled to back TTD benefits.

{3} Shortly after Varbel began receiving these benefits, Sandia became suspicious that Varbel may have begun working for the Las

Palmas Restaurants, which are owned by Varbel's boyfriend, Juan Valdez (Valdez). In an effort to learn whether Varbel was working at the restaurants, Sandia hired an investigator. The investigator followed Varbel for a total of five days in the spring of 1998. During that time, the investigator observed Varbel at the Las Palmas Restaurants for approximately one hour and fifteen minutes. On two occasions, the investigator observed Varbel enter one of the restaurants, remain there for approximately five minutes, and depart—once with a plate of food.

{4} On March 30, 1998, the investigator entered the Las Palmas Restaurant on Central Avenue. Varbel, who was standing behind the counter with an order book, asked the investigator if she could help· him. He commented on the menu's large selection and Varbel recommended a menu item. Varbel then took his order, took his payment, and made change for him from the register. Varbel took the order ticket to the kitchen. Later, she served his drink and meal. While eating, the investigator saw Varbel waiting on a party of two. As he was leaving, the investigator saw Varbel counting money.

{5} The following day, the investigator watched Varbel at the same restaurant. While positioned across the street, the investigator watched Varbel through binoculars. He saw her talking with two parties in the restaurant and one customer at the drive-up window. He did not see any exchanges of money, but he did observe Varbel handing bags of food to one customer in the restaurant and to the patron at the window. Less than an hour later, the investigator followed Varbel to the other Las Palmas Restaurant. He remained there for forty minutes. During that time, he watched the drive-up window with binoculars and observed Varbel handing food to and making change for one customer.

{6} On his final day of surveillance, the investigator did not see Varbel at either restaurant. Throughout his five days of observation, the investigator saw other employees at the restaurant, but never saw Varbel instruct those other employees in any way. Aside from the surveillance, the investigator did not do any other research or make any other inquiries. He never saw any applications for ˙employment from Varbel, time sheets, tax documents, or other personnel paperwork that would indicate that Varbel was an employee of Las Palmas. The investigator did not know if the restaurants paid Varbel, nor did Sandia introduce any evidence that the Las Palmas Restaurants paid Varbel.

{7} Even before the surveillance was completed, Sandia filed an application on March 31, 1998, seeking termination. Sandia's theory was that Varbel never reported that she had returned to work, as is required by the Workers' Compensation Rules and Regulations (the Rules).

{8} In addition to the surveillance evidence, Sandia presented the testimony of a process server who attempted to serve a subpoena on the restaurants on April 1, 1998. The process server entered the restaurant and waited at the counter. At that time, Varbel, who approached the counter from the back of the restaurant, was counting money. After placing the money in the cash register, she asked the process server how she could help him. When he attempted to deliver the subpoena, Varbel replied that she could not accept it, that she did not work at the restaurant, and that no one present had authority to accept the subpoena. Varbel also told one other man who was present in the restaurant not to accept the subpoena. The evidence is not clear as to whether this man was an employee or a guest of the restaurant.

{9} Finally, in its effort to demonstrate that Varbel worked at the Las Palmas restaurants, Sandia also called both Valdez and Varbel to testify. Valdez testified that Varbel had been spending time at the restaurants since the two began dating in January 1997, coming and going as she pleased. He also testified that Varbel was "always" at the restaurants, testifying further that by "always" he meant that Varbel was at the restaurants almost every day but for no more than one and one-half to two hours per day.

{10} Varbel admitted to occasionally waiting on customers, counting money, and delivering money to the bank for the two restaurants, but denied instructing employ-

ees of the restaurants. More generally, she answered "no" when counsel for Sandia asked her whether she had been working for the restaurants for the six months prior to the application hearing. Instead, although she conceded that she may have been at the restaurants as much as sixteen hours per seven-day week, Varbel testified that she did not consider what she was doing for the restaurants to be work.

{11} After considering the evidence, the WCJ terminated Varbel's TTD benefits. Varbel now appeals the Compensation Order terminating her benefits.

*DISCUSSION*

{12} On appeal, Varbel argues that the WCJ erred in finding fraud because Sandia failed to prove that she had returned to work or that she had defrauded Sandia into paying compensation benefits. Varbel also argues that the WCJ should not have reduced or terminated her benefits because Sandia failed to offer her work, which she claims is required by NMSA 1978, § 52–1–25.1 (1990). Finally, Varbel argues that even if we uphold the finding of fraud, the WCJ erred by failing to reduce her benefits according to the formula prescribed in Section 52–1–25.1(C). Varbel also seeks attorney fees for the appeal.

{13} This Court applies whole record review to the WCJ's decision to terminate Varbel's benefits. *See Tallman v. ABF (Arkansas Best Freight)*, 108 N.M. 124, 127, 767 P.2d 363, 366 (Ct.App.1988).

Whole record review . . . contemplate[s] a canvass by the reviewing court of all the evidence bearing on a finding or decision, favorable and unfavorable, in order to determine if there is substantial evidence to support the result. We analyze and examine all the evidence and disregard that which has little or no worth.

. . . [T]he reviewing court, after examining the evidence in the manner just described, decides whether there is evidence for a reasonable mind to accept as adequate to support the conclusion reached. The test is one of reasonableness.

*Id.* at 128, 767 P.2d at 367. With that in mind, we turn to an analysis of the first issue Varbel raises.

{14} Although it is not clear from the Compensation Order, there appear to have been two interrelated bases upon which the WCJ may have thought to rest his decision to terminate Varbel's benefits. The first appears to be that the WCJ concluded Varbel had returned to work (at the Las Palmas Restaurants) but had failed to report her return to Sandia, as required by 11 NMAC 4.3.12.1.2 (1996) (Rule 12.1.2). The WCJ then inferred that Varbel's failure to report was intentional, and therefore that she had fraudulently obtained TTD benefits.

{15} Rule 12.1.2 states, "When a Worker is receiving disability benefits, Worker shall report to Employer, within fifteen (15) days, any return to work, any written medical release to return to work provided to Worker, and any physical limitations imposed by a physician and provided to Worker in writing." In turn, 11 NMAC 4.3.12.3 (1996) (Rule 12.3) provides, "A violation of this section may result in the imposition of criminal, administrative and judicial sanctions." On the basis of those two rules the WCJ apparently assumed he could terminate Varbel's benefits based on a finding that Varbel fraudulently failed to report a return to work. That seems to be what the WCJ meant when, citing Rule 12.3, he wrote, "A sanction is appropriate where there is a failure to comply with the duty to report a return to work."

{16} Assuming the WCJ had the power to terminate Varbel's benefits under Rules 12.1.2 and 12.3, an issue we refrain from deciding here, we determine that there was not substantial evidence to support a conclusion that Varbel fraudulently failed to report a return to work, such that termination of her benefits was appropriate.

{17} The Act defines "fraud" as "the intentional misrepresentation of a material fact resulting in workers' compensation or occupational disablement coverage, the payment or withholding of benefits or an attempt to obtain or withhold benefits. The intentional misrepresentation of a material fact may occur through the conduct, prac-

tices, omissions or representations of any person." NMSA 1978, § 52–5–1.3(F) (1990). This is not unlike the definition of fraud New Mexico courts have applied in other contexts. *See, e.g., Cargill v. Sherrod,* 96 N.M. 431, 432–33, 631 P.2d 726, 727–28 (1981) ("Actionable fraud consists of misrepresentation of a fact, known to be untrue by the maker, and made with an intent to deceive and to induce the other party to act in reliance thereon to his detriment."). It is generally for the fact finder to determine whether fraud was proved. *See Rodriguez v. Horton,* 95 N.M. 356, 359, 622 P.2d 261, 264 (Ct.App.1980) ("The determination of whether a false representation was made belongs to the jury."); *Maxey v. Quintana,* 84 N.M. 38, 42, 499 P.2d 356, 360 (Ct.App.1972) ("Intent is usually a question for the jury."); *cf. Western States Mechanical Contractors, Inc. v. Sandia Corp.,* 110 N.M. 676, 679, 798 P.2d 1062, 1065 (Ct.App.1990) (including party's reasonable reliance on misrepresentation among questions for the fact finder in negligent misrepresentation case).

{18} A finding of fraud normally requires proof by clear and convincing evidence. *See Sauter v. St. Michael's College,* 70 N.M. 380, 385, 374 P.2d 134, 138 (1962). " 'For evidence to be clear and convincing, it must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with the abiding conviction that the evidence is true.' " *In re Termination of Parental Rights of Eventyr J.,* 120 N.M. 463, 466, 902 P.2d 1066, 1069 (Ct.App.1995) (quoting *In re Sedillo,* 84 N.M. 10, 12, 498 P.2d 1353, 1355 (1972) (per curiam)). Thus, coupled with our whole record review, we must determine whether "the fact finder could properly determine that the clear and convincing evidence standard was met." *Id.*

{19} In our view, the evidence will not support a finding under the clear and convincing standard that Varbel fraudulently failed to comply with Rule 12.1.2 by failing to report a return to work. Nothing in the record would support a finding that Varbel knew that she was required to report that she was assisting in her boyfriend's business without pay. Perhaps Rule 12.1.2 requires

workers to report such activity. But there is no evidence that Varbel knew of the Rule. Moreover, in our view, many, if not most, lay people would not consider unpaid assistance in the business of a close friend or relative to constitute "work." In the absence of more specific language in Rule 12.1.2, or evidence that Varbel understood the Rule to encompass such unpaid assistance, it would be improper to infer under the clear and convincing standard that Varbel knew that she was required to report such assistance.

{20} Additionally, there is insufficient evidence that Varbel was paid for her assistance with the restaurants. Sandia offered no documentary evidence that Valdez paid Varbel for her time at the restaurants. The WCJ simply disbelieved Varbel and Valdez when they testified that she volunteered her time. Such disbelief cannot be the basis of findings to the contrary.

{21} A finding that the testimony of a witness is not credible does not amount to a finding that the opposite of that witness's testimony is true. For, "however satisfied a court may be from the witness's demeanor or his [or her] demonstrated untruthfulness in other respects that certain testimony is false, it cannot use such disbelief alone to support a finding that the opposite was the fact." *Janigan v. Taylor,* 344 F.2d 781, 784 (1st Cir.1965), *superseded by statute on other grounds as stated in Alton ex rel. Alton v. Prudential–Bache Sec. Inc.,* 753 F.Supp. 39, 41 (D.Mass.1990); *see also Moore v. Chesapeake & Ohio Ry. Co.,* 340 U.S. 573, 576, 71 S.Ct. 428, 95 L.Ed. 547 (1951) (explaining that disbelief of a witness's testimony does "not supply a want of proof"). Rather, affirmative evidence (circumstantial or direct) of each element is necessary to support a finding of fraud. *Cf. Mitsugi Nishikawa v. Dulles,* 356 U.S. 129, 137, 78 S.Ct. 612, 2 L.Ed.2d 659 (1958) (holding that a party's burden of proof is not satisfied by discrediting the opposing party's witnesses; affirmative evidence is required). Moreover, none of the elements of fraud can be presumed. *See Sauter,* 70 N.M. at 385, 374 P.2d at 138. Because the WCJ based the termination of benefits on a finding of fraud, we need not decide what, if any, consequences

might flow from an unintentional failure to comply with Rule 12.1.2.

{22} The second possible basis for the WCJ's ruling requires little discussion. Under NMSA 1978, § 52-5-9 (1989), a workers' compensation judge may review a compensation order on any of several grounds, including "fraud, misrepresentation or other misconduct of an adverse party." Section 52-2-9(B)(5). If, after a hearing, the workers' compensation judge concludes that there is evidence to support the allegation giving rise to the review, he or she may modify the previous compensation order appropriately. *See* § 52-5-9(A). Because of its similarity to Rule 1-060 NMRA 1999, we can seek guidance from authority concerning Rule 1-060 or its federal equivalent in construing Section 52-5-9. *See Lucero v. Yellow Freight Sys.*, 112 N.M. 662, 666, 818 P.2d 863, 867 (Ct.App. 1991). It is generally understood that Rule 1-060(B)(3), which is virtually identical to Section 52-9-5(B)(5), allows a party to seek relief from a judgment that the adverse party *obtained* by fraud. *See* 11 Charles Alan Wright et al., *Federal Practice & Procedure* § 2859 (2d ed. 1995) ("Rule 60(b)(3) was added ... to make it clear that a motion will lie for relief from a judgment obtained by fraud....").

{23} Here, the WCJ suggested that Varbel may have acted fraudulently during the previous benefits hearing. However, our review of the record does not indicate that Varbel took the affirmative positions relating to her job duties that the WCJ appeared to attribute to her, and the WCJ himself appeared to take the position at the previous hearing that the issue of performance of job duties was irrelevant. In particular, Varbel never testified and never argued, through her attorney, that she was unable to perform her previous job duties, although Sandia took the position that such a showing would be necessary for Varbel to prevail. Varbel simply argued that her doctor's recommendation for surgery showed she was not at MMI and that, had the surgery taken place as recommended, Varbel would be unable to work. The WCJ said in his notice of proposed decision, "As Worker had not yet reached maximum medical improvement [due to the need for further surgery], and there was no job offer, and *even though it might well be that Worker was physically able to perform full job duties,* Worker would be entitled to temporary total disability benefits during the period in question." While the prior compensation order does find that Varbel was unable to perform job duties, this was a finding that was not specifically advocated for by Varbel and in light of the proposed decision could not be the basis for a finding of fraud by the WCJ. Therefore, under the circumstances of this case, we are compelled to agree with Varbel that there was insufficient evidence to support a finding of fraud on Varbel's part that would allow a WCJ to terminate benefits.

*CONCLUSION*

{24} For the foregoing reasons we reverse and remand to the WCJ to reinstate Varbel's TTD benefits and to award her reasonable attorney's fees. Because of our disposition, we need not address Varbel's remaining issues.

{25} **IT IS SO ORDERED.**

PICKARD, C.J., and HARTZ, J., concur.