2004-NMCA-056

92 P.3d 653

**John ROBERTSON, Plaintiff–Appellee,**

**and**

**Paul McGregor and Angela McGregor, Defendants/Cross Appellees,**

**v.**

**CARMEL BUILDERS REAL ESTATE and Charlie M. Cookson, Jr., Defendants–Appellants.**

No. 22,176.

Court of Appeals of New Mexico.

Nov. 21, 2003.

Certiorari Denied, No. 28,469, April 19, 2004.

Mark A. Reeves, Alamogordo, NM, for Appellee.

Steven K. Sanders, Albuquerque, NM, for Cross–Appellees.

Lynne Pruett, Hakanson & Pruett, P.C., Alamogordo, NM, for Appellant.

## OPINION

ROBINSON, Judge.

{1} On the Court's own motion, the opinion filed on this case on November 10, 2003 is

hereby withdrawn and the following is substituted therefor.

{2} This controversy arises from a real estate deal gone awry. The parties involved are qualifying broker, Charlie M. Cookson, d/b/a Carmel Builders Real Estate (CBRE); associate broker, Dixie Babcock; Paul and Angela McGregor ("Sellers"); and John Robertson ("Buyer").

{3} Defendant Cookson appeals the judgment against him and in favor of both Buyer and Sellers for fraudulent misrepresentation. Cookson raises several issues. He alleges: (1) the trial court erred in finding that Babcock and Cookson were in a principal/agent relationship; (2) the trial court did not establish the quantum of proof used to reach its determination; (3) the evidence was insufficient to establish the elements of fraud and the trial court failed to make the necessary findings to establish fraud; and (4) fraud was not pled with sufficient particularity.

{4} Cookson also challenges the propriety of the damages awarded to Buyer and Sellers. He argues: (1) punitive damages were improperly assessed against Cookson under the doctrine of respondeat superior; (2) punitive damages were not separately assessed between Babcock and Cookson; and (3) punitive damages should not have been awarded without actual damages. He contends the trial court erred in awarding attorney fees and costs because it awarded Sellers costs twice and included costs which are not allowed under Rule 1–054(D) NMRA 2000.

{5} We reverse the judgment of the trial court for that portion of the award which involved payment of per diem and travel expenses to Sellers in connection with appearing as witnesses in this matter. We affirm the remainder of the judgment.

## BACKGROUND

{6} In December 1994, Babcock formally listed Sellers' land for a period of six months. When the listing expired, Sellers permitted Babcock to keep a CBRE sign on the property. Cookson, the qualifying broker for CBRE, described the informal listing as an oral "pocket listing," meaning that Sellers would pay a commission to CBRE if Babcock found a buyer and Sellers accepted the buyer's offer. He stated that the listing was in effect up until the day of his testimony. Babcock also had a formal listing for Sellers' home at this time. The house sale discussions were simultaneous with the land sale discussions between Sellers and Babcock.

{7} In January 1997, Buyer's real estate agent, A.A. ("Web") Webster contacted Babcock to check the status of the listing on the land and to initiate negotiations on behalf of Buyer. Webster testified that he assumed CBRE had a listing agreement on the land, based on Babcock's subsequent negotiations with Buyer and on Cookson's letters reflecting knowledge of the details of the transaction. Further, CBRE never informed Webster that it had no listing agreement. Webster testified that Babcock "implied" that she had a listing agreement or "had one on the way" and said that Seller had told her to bring an offer and she would get a listing. Webster also testified, on cross examination, that he could have contacted Sellers directly if Babcock had no listing agreement, but that Babcock directly told him she had a listing agreement. If Babcock had informed him there was no listing agreement, Webster would not have been required to split a commission on the sale. The trial court found that Babcock "represented that she had a listing" for the land, and solicited an offer from Buyer.

{8} Cookson testified that Babcock was an independent contractor, not an employee of CBRE, that he would not have received any part of a commission on the land sale, and did not receive any commission on the sale of Sellers' house. He testified that Babcock paid him a monthly fee only, and it would not matter whether she sold one piece of property or fifty. Cookson also testified that he was aware of Buyer's offer on the day Webster delivered the purchase agreement to CBRE, and that he discussed with Babcock how to get a signed listing agreement because "that's how Realtors get paid." He believed Babcock had a duty to keep him informed of the sale, and she kept him informed on a routine basis. Cookson was also aware of two contingencies in the purchase agreement: dirt work and financing.

{9} Mr. McGregor testified that he would have given Babcock a listing if the sale had gone through, and that Babcock tried to convince Sellers to give her the listing several times. Babcock always used CBRE letterhead, CBRE fax cover sheets, and signed documents as an associate broker for CBRE when dealing with Sellers, and had Cookson's authorization to do so. Babcock never said she was an independent contractor.

{10} When Webster notified Babcock that Buyer was interested in purchasing the land, Babcock faxed him a three-year-old disclosure statement Sellers made when they originally gave Babcock a listing on the land. The out-of-date disclosure, which indicated that utilities were at the property line of the land, was no longer accurate because Sellers had sold an adjacent lot. Neither Babcock nor Cookson informed Sellers that the old disclosure had been sent to Webster.

{11} On January 21, 1997, Babcock called Sellers and asked whether the land was still for sale. Sellers told Babcock they would sell the land for $100,000. The same day, Buyer made a written offer for $62,500. Babcock presented Buyer's offer to Sellers and when Mr. McGregor saw the offer, he told Babcock that he would not take less than $100,000 for the land. Sellers submitted a counter offer for $100,000 with a January 28, 1997 deadline. Buyer submitted a counter offer on January 27, 1997 of $80,000, which expired at 6:00 p.m. January 29, 1997.

{12} Without making any other written offers, Sellers told Babcock they would not sell for less than $100,000. Babcock told Buyer that Sellers would take no less than $100,000. Buyer made an offer to purchase the land for $100,000 on January 30, 1997, assuming the accuracy of the 1994 disclosure statement Babcock had faxed to Webster, stating that the utilities were on the property. Buyer's offers were contingent on getting dirt work done on the land and obtaining financing.

{13} After Babcock informed Sellers that Buyer had consulted an attorney regarding the utilities, Sellers informed Babcock they did not want to go through with the sale, even if the offer had been for $150,000. Sellers did not acknowledge Buyer's $100,000

offer in any way, and explicitly told Babcock they did not intend to proceed in any further dealings with Buyer. Buyer's agent testified that Babcock gave him a "verbal Counteroffer Number 3," which Buyer accepted, although there was nothing in writing to show Sellers had made a counteroffer. Sellers believed that negotiations were at an end, there was no contract of sale, and the negotiations were "dead," and told Babcock so on January 29.

{14} Cookson knew Sellers considered the deal to be "dead." Cookson testified that he attempted to get a written listing agreement from Sellers even after Sellers had told Babcock the deal was dead "so *we* would be paid." (Emphasis added). Buyer testified that he would never have made an offer on the land at all if he had known CBRE had no formal listing agreement on it, and he would not have hired an appraiser, contracted for backhoe work, and had blueprints done if he had known there was no valid contract for sale of the land. Cookson authorized the backhoe work on Sellers' land and also personally negotiated getting power to the property. Sellers never authorized digging on their land. The trial court found that as Buyer invested in improvements, the agents "sought to coerce or otherwise persuade [Sellers] to sell their tract."

{15} Buyer did not know that Sellers believed there was no valid contract until he received letters from Cookson, dated April 16, 1997 and April 30, 1997, stating that the contract had contingencies which had to be removed in order to close and that Sellers felt there was no contract. On April 30, 1997, Webster wrote a letter to CBRE removing the contingencies. Buyer attended the May 1, 1997, closing on the land, but Sellers, Babcock and Cookson did not. The trial court found that at the time of closing on the land, it became apparent to everyone that there had "never been a sale agreement." The trial court found that Babcock, at all material times, had been acting as an agent under Cookson, her qualifying broker, and that Babcock and Cookson had damaged both Buyer and Sellers through their fraudulent misrepresentations.

{16} The trial court awarded compensatory damages to Buyer in the amount of $26,362.47 including his land-related expenditures, attorney fees, and costs against Babcock and Cookson. In addition, the trial court awarded Buyer $20,000 in punitive damages assessed against Babcock and Cookson. The trial court awarded compensatory damages to Sellers in the amount of $27,500, including attorney fees, costs, and personal expenses, and also awarded them $20,000 in punitive damages assessed against Babcock and Cookson. Default judgment was entered against Babcock for failure to appear, and her counsel withdrew based on lack of communication and inability to locate her. Buyer's claims against Sellers were dismissed. Even though Sellers had made a counterclaim against Buyer as well as a cross-claim against Babcock and Cookson, Sellers made a full recovery for all damages prayed for. "Where a judgment declares the rights and liabilities of the parties to the underlying controversy, a question remaining to be decided thereafter will not prevent the judgment from being final if resolution of that question will not alter the judgment or moot or revise the decisions therein." *Kelly Inn No. 102 v. Kapnison*, 113 N.M. 231, 238, 824 P.2d 1033, 1040 (1992).

## DISCUSSION

*The Relationship Between Cookson and Babcock*

{17} We must determine whether a principal/agent relationship existed between Cookson and Babcock. Cookson argues that the trial court erred in finding that Babcock was his agent and by attributing fraudulent conduct by Babcock to him under the doctrine of respondeat superior. Cookson also argues about whether an agency relationship existed between Babcock and Sellers or himself and Sellers. To the extent that the relationship between the real estate agents and Sellers is relevant, it is discussed in the section addressing whether substantial evidence exists to support the finding of fraud against Sellers' agents, Babcock and Cookson.

1. In citing to the NMAC rules all citations are to the 2002 version which is in all relevant parts

{18} " 'An agent is a person who, by agreement with another called the principal, represents the principal in dealings with third persons or transacts some other business, manages some affair or does some service for the principal, with or without compensation.' " *Madsen v. Scott*, 1999–NMSC–042, ¶ 8, 128 N.M. 255, 992 P.2d 268 (quoting UJI 13–401 NMRA 1999). Defining an agency relationship presents a mixed question of law and fact requiring application of the substantial evidence standard for review of the facts and then a de novo review of the trial court's application of the law to those facts. *State v. Reynolds*, 119 N.M. 383, 384, 890 P.2d 1315, 1316 (1995). However, where the material facts are undisputed and susceptible of but one logical inference, the existence of such a relationship becomes a conclusion of law. *Madsen* 1999–NMSC–042, ¶ 9, 128 N.M. 255, 992 P.2d 268.

{19} The trial court found, based on Cookson's admission that he was the "qualifying broker" for CBRE and that Babcock was an associate broker, that Babcock was Cookson's agent as a matter of law. We agree. A qualifying broker has a duty to supervise activities of associate brokers, has a duty to maintain a written contract or employment agreement and, upon termination or discharge of an associate broker, within forty-eight (48) hours must mail or deliver the license of the associate to the Real Estate Commission. 16.61.16.9(D), (J) NMAC 2002.[1] An associate broker may not engage in any real estate activities requiring a real estate license without the knowledge and supervision of a qualifying broker and may not receive commissions or fees related to real estate activities requiring a real estate license from anyone other than a qualifying broker. 16.61.17.9 NMAC 2002. An associate broker must conduct all real estate related business for others in the trade name of the brokerage, and remit all monies of others related to transactions to the qualifying broker as soon after receipt as is practicably possible. *Id.* As our Supreme Court noted, in accordance with these rules, a "real

substantially the same as the version which was in effect at the time this controversy arose.

estate salesperson is his or her qualifying broker's agent" and

> [b]ecause a real estate salesperson must work under a broker, when a principal buyer or seller engages a real estate salesperson as an agent, the principal also engages the salesperson's qualifying broker as an agent, thus extending the fiduciary duty owed to the principal buyer or seller up the salesperson's chain of command to the broker.

*Moser v. Bertram*, 115 N.M. 766, 767–768, 858 P.2d 854, 855–856 (1993).

{20} Although we find that the regulations of the Real Estate Commission necessarily impose the duties and responsibilities which define a principal/agency relationship upon Cookson and Babcock, we note that upon our review of the transcripts, the evidence at trial also satisfied the substantial evidence standard of review. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate support for a conclusion." *Samora v. Bradford*, 81 N.M. 205, 207, 465 P.2d 88, 90 (Ct.App. 1970). When determining whether a finding of fact is supported by substantial evidence, we review the evidence in the light most favorable to upholding the finding and indulge all reasonable inferences in support of the trial court's decision. *Id.* Although Cookson argues that he was using the term "loosely," he identified Babcock as his agent in a deposition. More importantly, he admitted that Babcock kept him informed of developments in the transaction at all times; that he saw documents Babcock received on a daily basis; that he knew Buyer was doing dirt work on the property despite Sellers' clear understanding that no contract for the sale had been made; that he believed it was Babcock's duty to keep him informed about the sale of the land; and that he was aware of contingencies in the original purchase agreement submitted by Buyer.

{21} Liability of a principal for an agent is grounded on the maxim of respondeat superior and is determined by considering whether a tortious act was done while the agent or employee was acting within the scope of that relationship. *Tercero v. Roman Catholic Diocese*, 2002–NMSC–018, ¶ 21, 132 N.M. 312, 48 P.3d 50. There appears to be no question that Babcock was acting within the scope of her agency and, in any case, a principal is also responsible for the acts of an agent when the principal has clothed the agent with the appearance of authority. *Chevron Oil Co. v. Sutton*, 85 N.M. 679, 682, 515 P.2d 1283, 1286 (1973). Babcock was clearly clothed with the appearance of authority since she always used CBRE letterhead and CBRE fax cover sheets, and signed documents as an associate broker for CBRE with Cookson's authorization.

{22} Cookson argues that he is nonetheless shielded from liability because Babcock had an "independent contractor" agreement with him. We are not persuaded by this argument. The majority rule, which is also the rule in New Mexico, is that "the manner in which the parties designate a relationship is not controlling, and if an act done by one person on behalf of another is in its essential nature one of agency, the one is the agent of the other, notwithstanding he is not so called." *Id.*

{23} Cookson also argues that the trial court's ruling cannot support liability under a respondeat superior theory because the court failed to make the specific finding that Babcock was Cookson's "employee" rather than his agent. However, under a respondeat superior theory, "the liability of a principal for the tortious act of an agent is the same as the liability of an employer for the tortious act of an employee." *Tercero*, 2002–NMSC–018, ¶ 21, 132 N.M. 312, 48 P.3d 50. Accordingly, there was no need for the trial court to find that Babcock was Cookson's employee rather than his agent.

*Evidence of Fraud*

*Quantum of Proof*

{24} Cookson cites *Sands v. American G.I. Forum of N.M., Inc.*, 97 N.M. 625, 629, 642 P.2d 611, 615 (Ct.App.1982), for the proposition that, where it cannot be determined from the trial court's findings and conclusions what standard of proof was used, the case must be remanded for specific findings.

However, in *Sands*, unlike the present case, there was evidence that the trial court had likely applied the wrong standard of proof. The trial court in *Sands* specifically stated that it was applying a preponderance of the evidence standard. *Id.* at 628, 642 P.2d at 614.

{25} At trial, Cookson correctly argued that Buyer was required to prove fraud by clear and convincing evidence. *See Rodriguez v. Horton,* 95 N.M. 356, 359, 622 P.2d 261, 264 (Ct.App.1980) (stating fraud must be established by clear and convincing evidence). Although the trial court did not state in its judgment what quantum of proof was applied, there is no indication in the record that the trial court applied any standard other than the clear and convincing standard to which the trial court was alerted. This Court remands for specific findings "[w]here doubt or ambiguity exists as to the basis for the court's ruling." *Corlett v. Smith,* 106 N.M. 207, 211, 740 P.2d 1191, 1195 (Ct.App.1987). The burden is on the appellant to clarify how the trial court erred. *Farmers, Inc., v. Dal Mach. & Fabricating, Inc.* 111 N.M. 6, 8, 800 P.2d 1063, 1065 (1990). Cookson did not provide any testimony or statement to indicate that the trial court applied the wrong quantum of proof. Accordingly, we will not presume error.

*Trial Court's Findings*

{26} Cookson also argues that the trial court failed to make the ultimate factual findings required to prove fraud. "Findings are to be liberally construed in support of the judgment. The findings are sufficient if a fair construction of all of them, taken together, justify the trial court's judgment." *H.T. Coker Constr. Co. v. Whitfield Transp., Inc.,* 85 N.M. 802, 804, 518 P.2d 782, 784 (Ct.App.1974) (internal citations omitted). The elements of fraud are a false representation, knowingly or recklessly made, with the intent to deceive, on which the other party acted to his detriment. *Sauter v. St. Michael's College,* 70 N.M. 380, 384–385, 374 P.2d 134, 138 (1962). Cookson argues that the trial court failed to make any findings establishing that Cookson knowingly or recklessly made the false representation with the intent to deceive Buyer, and that the trial court failed to make any of the requisite findings with regard to defrauding Sellers.

{27} The trial court made numerous factual findings regarding the fraudulent actions of Cookson and Babcock. Although the court did not specifically state which facts are related to each of the elements, "the court nonetheless defined a general nexus between the findings of fact and conclusions of law sufficient to establish the tort of fraud." *Register v. Roberson Constr. Co.Inc.* 106 N.M. 243, 246, 741 P.2d 1364, 1367 (1987). The trial court found that because Buyer invested in improvements, Cookson "sought to coerce or otherwise persuade [Sellers] to sell their tract," and that Babcock at all material times had been acting as an agent under Cookson, her qualifying broker, and that Babcock and Cookson had damaged both Buyer and Sellers through their intentional misrepresentations. A fair construction of all of the court's findings and conclusions, taken together, supports the trial court's judgment in this case.

*Substantial Evidence*

{28} Cookson also contends that there was no substantial evidence to support the trial court's finding of fraud. The parties cite *Varbel v. Sandia Auto Elec.,* 1999–NMCA–112, ¶ 13, 128 N.M. 7, 988 P.2d 317, for the proposition that whole record review is appropriate in this case. The court in *Varbel,* however, provides the applicable standard of review with regard to administrative proceedings, *id.,* not trial court proceedings. In determining whether or not there is substantial evidence to support the trial court's findings, we look only at the evidence favorable to the appellees. *Galvan v. Miller,* 79 N.M. 540, 546, 445 P.2d 961, 967 (1968). It is for the fact finder, not the appellate court, to weigh the evidence. *Rodriguez,* 95 N.M. at 359, 622 P.2d at 264. We determine that there is substantial evidence establishing fraud on the part of Cookson in relation to both Buyer and Sellers.

{29} Cookson argues that the evidence is insufficient to support a finding that Cookson, as opposed to Babcock, engaged in fraudulent conduct in this regard. Since we

are affirming the trial court's holding that Babcock was Cookson's agent, the evidence is sufficient to support a finding of fraud on the part of Cookson if there is substantial evidence on the record that Babcock committed fraud. We need not determine if there is substantial evidence in the record that Cookson's actions alone constituted fraud.

{30} There is substantial evidence in the record that Babcock, as Cookson's agent, acted fraudulently towards both Buyer and Sellers. As the trial court found, there was testimony that, despite having no listing agreement, Babcock represented that the property was listed with CBRE. There was testimony that Cookson was aware that Sellers informed Babcock on January 29, 1997, that negotiations were at an end and that they had no intention of selling the property to Buyer; and that the agents continued to negotiate on behalf of Sellers and to lead Buyer to believe he had purchased the property. There was also testimony that Buyer and Sellers relied on these misrepresentations to their detriment.

{31} Cookson makes the additional argument that he cannot be held liable for breaching any duties to Sellers by failing to disclose the subsequent unauthorized negotiations with Buyer because the acts constituting fraud against Sellers largely consist of failures to disclose or inform, and there was no written agency agreement between Sellers and CBRE establishing such a duty. This argument misses the point. The trial court did not hold Cookson liable for breaching a contractually imposed fiduciary duty to Sellers, but instead for committing the intentional tort of fraud. "An omission as well as an act, may constitute fraud. When one is under the duty to speak, but remains silent and so fails to disclose a material fact, he may be liable for fraud." *Wirth v. Commercial Resources, Inc.*, 96 N.M. 340, 345, 630 P.2d 292, 297 (Ct.App.1981). "To reveal some information on a subject triggers the duty to reveal all known material facts." *Id.*

{32} We find that a continuing duty to disclose had been triggered by the actions of Babcock and Cookson. Since these two agents, Babcock and Cookson, continued conducting negotiations on Sellers' behalf de-spite being instructed by Sellers to discontinue these negotiations, they were under a duty to disclose to Sellers the fact that negotiations had not yet halted and that, in fact, they were working towards closing the deal with Buyer. The real estate agents had a special relationship with Sellers, arising not only from that which had already been disclosed, but also from the "definite fiduciary" relationship between the parties, and the Sellers' trust reposed in the agents from previous sales. *See R.A. Peck, Inc. v. Liberty Fed. Sav. Bank*, 108 N.M. 84, 89, 766 P.2d 928, 933 (Ct.App.1988)(enumerating categories of existing relationships that give rise to a duty to disclose); *see also Swallows v. Laney*, 102 N.M. 81, 84, 691 P.2d 874, 877 (1984)("A fiduciary relationship exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of one reposing the confidence.") (internal citation and quotation marks omitted).

*Sufficiency of the Pleadings*

{33} Cookson also alleges that the judgment should be reversed due to both Buyer's and Sellers' failure to plead fraud with specificity, as required by Rule 1–009(B) NMRA 2003. Cookson preserved this issue in his motion in limine.

{34} We are not persuaded. The evidentiary details of a claim of fraud need not be alleged. *Steadman v. Turner*, 84 N.M. 738, 740, 507 P.2d 799, 801 (Ct.App. 1973). There is sufficient particularity in the pleading if the facts alleged are facts from which fraud will be necessarily implied and the claim asserted should be clear to Cookson. *See Id.*

{35} Cookson complains that both Buyer's and Sellers' complaints fail to state specifically that the allegations of fraud were based on Cookson's failure to inform Buyer that Sellers considered the deal to be "dead," and do not state the facts surrounding the fraud. Cookson also claims that Buyer's complaint was limited to the allegation that the continued presence of a "for sale" sign on the property constituted fraud. However, the

facts pled do not limit the allegations of fraud to the continued presence of the sign and, in the complaints of both Buyer and Sellers, the general and specific allegations of ongoing false representations by Babcock and Cookson regarding cessation of negotiations are of sufficient particularity to apprise Cookson of the claims asserted against him.

*Punitive Damages*

■ {36} Cookson also challenges the propriety of the punitive damages awarded to Buyer and Sellers. He argues that punitive damages were improperly assessed against him under the doctrine of respondeat superior and that the trial court erred by not separately assessing the punitive damages between Babcock and him. Cookson also argues that punitive damages were improperly awarded to Sellers since they were not awarded any actual damages. We review the trial court's findings regarding punitive damages for abuse of discretion. *Eckhardt v. Charter Hosp., Inc.,* 1998–NMCA–017, ¶ 57, 124 N.M. 549, 953 P.2d 722.

■ {37} " '[A] principal can only be held liable for punitive damages when the principal has in some way authorized [or] ratified ... its agent.' " *Rhein v. ADT Auto., Inc.,* 1996–NMSC–066, ¶ 31, 122 N.M. 646, 930 P.2d 783 (quoting *Albuquerque Concrete Coring Co., Inc. v. Pan Am World Servs., Inc.,* 118 N.M. 140, 143, 879 P.2d 772, 775 (1994)). Cookson argues that there is no substantial evidence demonstrating that he authorized, ratified, or participated in the fraudulent acts of Babcock. We disagree.

■ {38} Because an appellate court does not reweigh the evidence, we only examine whether substantial evidence supports the trial court's ruling after viewing the facts and all reasonable inferences in the light most favorable to the prevailing party. *Eckhardt,* 1998–NMCA–017, ¶ 57, 124 N.M. 549, 953 P.2d 722. Cookson testified: that Babcock kept him informed of all developments in the real estate transaction; that Babcock, with Cookson's authority, always used CBRE letterhead, CBRE fax cover sheets; that Babcock signed documents as an associate broker for CBRE when dealing with the parties; that he attempted to get a written listing agreement from Sellers even after Sellers had told Babcock the deal was dead "so *we* would be paid" (emphasis added); and that he authorized the backhoe work on Sellers' land and also personally worked on getting power to the land. There is substantial evidence that Cookson participated in, authorized, and ratified Babcock's fraudulent acts.

■ {39} Cookson correctly alleges that punitive damages generally must be separately determined when assessed against two or more defendants. *Vickrey v. Dunivan,* 59 N.M. 90, 94, 279 P.2d 853, 856 (1955). This case, however, is easily distinguished from *Vickrey.* In *Vickrey,* the jury awarded punitive damages against multiple defendants, one of whom was subsequently released from liability, leaving no possible way to determine the remaining defendants' share of the punitive damages. *Id.* at 93–94, 279 P.2d at 855–56. Each defendant in that case was being held individually liable. *Id.*

■ {40} In this case, we are presented with a judgment for punitive damages against a principal and his agent, not simply two co-defendants. The trial court made the award of punitive damages to both Buyer and Sellers against "Defendants Babcock and Cookson in the amount of $20,000.00." The trial court did not parse out who was responsible for what amount, but rather found the two defendants to both be liable for the $20,000 awarded to each party. The liability of a principal for his agent is vicarious in nature. *Samedan Oil Corp. v. Neeld,* 91 N.M. 599, 603, 577 P.2d 1245, 1249 (1978) (stating that there is no *"vicarious* liability for punitive damages on the part of a master or principal absent participation, authorization or ratification of the tortious conduct.") (Emphasis added). Therefore, a principal who ratifies or participates in fraudulent acts of an agent is held responsible for the fraud, by operation of law, to the same extent as the agent.

■ {41} Accordingly, we hold that when a principal is held liable under the theory of respondeat superior, and punitive damages are appropriate due to the principal's ratifi-

cation of or participation in an intentional tort, there is no need to allocate separate awards of punitive damages against the principal and agent, as their liability is equal. Cookson is liable for $20,000 in punitive damages to Buyer and $20,000 in punitive damages to Sellers.

{42} Cookson argues that the trial court did not award any compensatory damages to Sellers and that accordingly there is no basis for an award of punitive damages to Sellers. Cookson cites *Garcia v. Coffman*, 1997–NMCA–092, 124 N.M. 12, 946 P.2d 216, for the assertion that an award of punitive damages must be supported at least by an award of nominal damages. In *Garcia*, we stated that "proof of actual damages was not necessary to

> sustain [the][p]laintiff's cause of action for fraud and that it was *within the province* of the judge or jury to award nominal damages to acknowledge that the cause of action was established and punitive damages to punish [the defendant] for violating Plaintiff's rights.

*Id.* ¶ 36 (emphasis added). First, we note that it is not clear that the trial court did not award nominal damages to Sellers. In its judgment, the trial court awarded Sellers damages for attorney fees, costs, and personal expenses. We read the award of personal expenses as the functional equivalent of nominal damages.

{43} In any case, this Court in *Garcia* did not require an award of nominal damages to demonstrate that a cause of action has been established. The language in *Garcia* is permissive and under *Sanchez v. Clayton*, 117 N.M. 761, 877 P.2d 567 (1994), upon which *Garcia* relies, we believe an award of nominal damages, although permitted, is not required. In *Sanchez*, our Supreme Court stated:

> [T]he most reasonable interpretation of the supposed actual damages requirement is that it is really a defective formulation of an entirely different idea—that the plaintiff must establish a cause of action before punitive damages can be awarded ... Once the facts accepted by the trier show a valid cause of action, however, there seems no reason to deny punitive damages mere-

ly because the plaintiff's damages are not pecuniary, or because the jury awards nominal damages, or because it lumps all damages under the punitive label. Indeed, if the defendant's conduct otherwise warrants punitive liability, the need for punishment or deterrence may be increased by reason of the very fact that the defendant will have no liability for compensatory damages.

*Sanchez*, 117 N.M. at 767, 877 P.2d. at 573. *Sanchez* further states that in suits based on intentional torts, it is not necessary that the party allege actual damages. *Id.*

{44} In *Archer v. Roadrunner Trucking, Inc.*, 1997–NMSC–003, ¶ 13, 122 N.M. 703, 930 P.2d 1155, our Supreme Court interpreted *Sanchez* as holding that an award of general damages, whether actual, compensatory or nominal, is not required to recover punitive damages. The Court stated:

> In *Sanchez*, we held that before a plaintiff may recover punitive damages he or she must state a cause of action under which he or she is *entitled* to actual, compensatory, or nominal damages depending on the nature of the case ... Following the logic of *Sanchez*, while the injured person need not in fact have recovered general damages in order for his or her spouse to recover loss-of-consortium damages, the injured spouse must have been entitled to an action for general damages.

¶ 13 (emphasis in original).

{45} The trial court found that Sellers established a valid cause of action for fraud, and in accordance with *Sanchez*, we see no reason to deny Sellers punitive damages because the court either labeled nominal damages as personal expenses or lumped all damages under the punitive label. *See Sanchez*, 117 N.M. at 767, 877 P.2d. at 573.

{46} We conclude that the punitive damages awarded to Buyer and Sellers were proper in all respects.

*Attorney Fees and Costs*

{47} Both parties agree that it was within the trial court's discretion to award attorney fees in an action for fraud. The only issue

raised is the reasonableness of the fee award. We will not reach issues not raised by the parties. *State v. Fish*, 102 N.M. 775, 777, 701 P.2d 374, 376 (Ct.App.1985) (stating that if a party fails to brief an issue that party waives review of it). Accordingly, we do not address the overall propriety of attorney fees in a fraud case, but merely the reasonableness of the award in this case.

▬ {48} The trial court has broad discretion in setting attorney fees, and an award will not be reversed unless there is an abuse of discretion. *Miller v. Johnson*, 1998–NMCA–059, ¶ 34, 125 N.M. 175, 958 P.2d 745. We have previously explained that "[a] trial court abuses its discretion when its decision is contrary to logic and reason." *Roselli v. Rio Communities Serv. Station, Inc.*, 109 N.M. 509, 512, 787 P.2d 428, 431 (1990).

▬ {49} Buyer's attorney fees were based on an affidavit by attorney Mark Reeves. The pretrial and post-trial work on the case was done by Reeves, and his fee affidavit states that the fees were "necessarily incurred in this action and that the services for which fees have been charged were actually and necessarily performed." Cookson complains that the fees were not itemized, but instead lists a lump sum and is thus per se unreasonable. Cookson cites no authority for this proposition. Absent cited authority, we will not review the issue. *In re Adoption of Doe*, 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984). Cookson also fails to cite where in the record he allegedly objected to the affidavit. *See Pinnell v. Bd. of County Comm'rs*, 1999–NMCA–074, ¶ 11, 127 N.M. 452, 982 P.2d 503 (noting where party failed to cite to any portion of the record supporting its allegation, argument would not be considered).

▬ {50} Sellers' fees were based on bills entered into evidence over Cookson's objection on relevancy grounds. Cookson argues that he should not be liable for attorney fees resulting from the legal actions between Buyer and Sellers and also that the fees were generally excessive and unreasonable. This argument was preserved in Cookson's motion in limine.

{51} The trial court expressly found that all of the attorney fees resulted from Defendants' fraudulent conduct. Also, Sellers were forced to contest Cookson's affirmative defenses. As we stated in *First Nat'l Bank v. Diane, Inc.*, 102 N.M. 548, 555, 698 P.2d 5, 12 (Ct.App.1985)(quoting *Sorenson v. Fio Rito*, 90 Ill.App.3d 368, 45 Ill.Dec. 714, 413 N.E.2d 47, 52 (1980)):

> Had the plaintiff been forced to hire an accountant to repair the damage caused by the defendant's conduct, she would undoubtedly have been entitled to recover the accountant's fee as an ordinary element of damages. There is no basis in logic for denying recovery of the same type of loss merely because the plaintiff required an attorney instead of an accountant to correct the situation caused by the defendant's neglect. In holding the defendant liable for the plaintiff's losses, we are not violating the policy against "penalizing" a litigant for defending a lawsuit. We are simply following the general rule of requiring a wrongdoer to bear the consequences of his misconduct.

{52} There is nothing in the record to indicate that the fees claimed were unreasonable. The trial court did not abuse its discretion in its awards of attorney fees to each Buyer and Sellers. Accordingly, we affirm the trial court's award of attorney fees.

▬ {53} Cookson also alleges that the trial court awarded Sellers costs twice and included costs which are not allowed under of Rule 1–054(D), specifically deposition costs, copies and postage, and per diem and travel costs. The assessment of costs is entrusted to the sound discretion of the court. *In re Adoption of Stailey*, 117 N.M. 199, 203, 870 P.2d 161, 165 (Ct.App.1994). We will not interfere with an award of costs absent a showing of an abuse of discretion. *Id.*

▬ {54} Sellers filed an itemized cost bill. Cookson subsequently filed a motion to quash the itemized cost bill, in which he argued that the cost bill had been filed prematurely by Sellers and that Sellers were not entitled to costs for per diem and travel in connection with Sellers being subpoenaed

as witnesses. Cookson did not object to allowing costs for taking Buyer's deposition or for postage and copies. "It is well-settled that objections must be raised below to preserve an issue for appellate review." *State v. Lucero,* 104 N.M. 587, 590, 725 P.2d 266, 269 (Ct.App.1986). Hence we address only the propriety of the costs awarded for travel and per diem. We do not find that Sellers were awarded costs twice. In the trial court's order on Sellers' cost bill the trial court specifically stated that those costs, totaling $2090.96, "shall be allowed in addition to the judgment previously entered." Cookson cites no evidence, and we could find none, showing that the costs awarded by the trial court in the order are duplicative.

{55} The trial court awarded Sellers costs of transportation and per diem in the sum of $440.00 for travel from Lubbock, Texas, to Alamogordo, New Mexico for trial. We agree it was error to award travel and per diem to Sellers as a cost. Costs are recoverable only when they come within the ambit of a statute. *Swallows,* 102 N.M. at 86, 691 P.2d at 879. As a general rule, a party is not entitled to per diem or mileage expenses for appearing as a witness in his own case. *Id.* Sellers argue that the general rule is inapplicable since they received a subpoena too close to trial for their motion for protective order to be filed. Sellers cite no authority for an exception to the rule that parties are not entitled to be treated as ordinary witnesses and we did not find any.

**CONCLUSION**

{56} The judgment of the trial court is affirmed except for the portion of the cost bill which allowed Sellers to recover per diem and travel costs. As to that issue, the matter is reversed and remanded for entry of an amended judgment eliminating the award of Sellers' per diem and travel costs.

{57} **IT IS SO ORDERED.**

WE CONCUR: JAMES J. WECHSLER, Chief Judge, and A. JOSEPH ALARID, Judge.