**Certiorari Granted, May 6, 2010, No. 32,324**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2010-NMCA-036**

**Filing Date: March 16, 2010**

**Docket No. 28,079**

**BILL J. PAPATHEOFANIS,**

      **Plaintiff/Counter-Defendant-Appellee,**

**v.**

**KATHERINE ALLEN,**

      **Defendant/Counter-Claimant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF LOS ALAMOS COUNTY**
**James A. Hall, District Judge**

Scheuer, Yost & Patterson, P.C.
Tony F. Ortiz
Kristin L. Davidson
Santa Fe, NM

for Appellee

James K. Leven
Chicago, IL

for Appellant

**OPINION**

**FRY, Chief Judge.**

**{1}**    Defendant Katherine Allen appeals from a jury verdict finding her liable for fraud, breach of fiduciary duty, malicious abuse of process, and defamation. Based on these findings of liability, the jury awarded Plaintiff Bill Papatheofanis, Katherine's ex-husband, $257,500 in compensatory and punitive damages. On appeal, Katherine argues that there was insufficient evidence to support the elements of a fraud claim and that New Mexico's

1

public policy either prohibits spouses from recovering against each other for intentional torts or requires that there be sufficiently outrageous conduct before spouses can bring intentional tort claims against each other. For the following reasons, we affirm the judgment entered against Katherine.

**BACKGROUND**

**{2}** Katherine and Bill were married in 2002 and had one child, Matthew, in 2004. In 2005, Bill and Katherine filed for divorce. Prior to the divorce, a number of events transpired that form the basis of the civil complaint at issue in this appeal.

**{3}** In October 2004, Katherine informed Bill that if something were to happen to him, their son would not have any interest in the family home, which was Bill's solely owned property, and that Bill therefore needed to sign a quitclaim deed giving Katherine a one-half interest in the home. At the time, Bill did not have a will, and consequently, Katherine's representation about what would happen if Bill died was contradicted by New Mexico law. As the district court instructed the jury, New Mexico law provides that one-fourth of an intestate estate passes to a surviving spouse if the decedent has surviving issue, and the remainder of the estate passes to the surviving issue. As a result of Katherine's representation, Bill executed a quitclaim deed prepared by Katherine giving up one-half of his previously undivided interest in his property. Bill testified that he signed the quitclaim deed because he trusted Katherine, who was an attorney and a mortgage loan officer familiar with real estate and the law.

**{4}** In January 2005, Katherine opened a credit card account without Bill's knowledge, apparently by forging Bill's signature on the application form. Because Katherine had the bills sent to a post office box that Bill was unaware of, Bill did not find out about the credit card account for a significant period of time. According to Bill's testimony, Katherine had obtained more than one credit card by forging his signature. In addition, after Katherine left Bill, she attempted to lease a new vehicle using Bill's information without Bill's authorization. Just prior to leaving Bill, Katherine had also filed a patent application for an invention of Bill's without his knowledge or consent.

**{5}** In June 2005, Katherine sought an order of protection from domestic abuse, alleging that Bill had twisted Katherine's mother's arm and had threatened to shoot and kill her when Katherine and her mother had met Bill outside the Santa Fe cathedral. During the alleged incident, however, Bill was surreptitiously recording the encounter, and the tape of the incident did not reflect any of the threats or conduct that Bill was accused of. Shortly after finding out that Bill had a tape recording of the incident, Katherine dropped the domestic violence complaint against him.

**{6}** In July 2006, Bill was escorted out of his work area at Los Alamos National Laboratory so that he could speak with some investigators from the office of the department of energy's inspector general. The investigators informed Bill that they were investigating allegations that Bill had embezzled money from the laboratory, that he was fraudulently selling equipment to the laboratory, that he was mentally unstable, that he had gone on frivolous travel, had unauthorized laboratory equipment at home, and had accepted illegal

gratuities from companies he had purchased equipment from. The investigators then proceeded to search Bill's vehicle in the parking lot. Following that search, Bill consented to have his home searched. Bill eventually discovered that Katherine had made the allegations against him. None of the allegations that Katherine had raised were substantiated by the investigation or the search of Bill's home.

**{7}** Based on Katherine's conduct, Bill filed a civil complaint for fraud, breach of fiduciary duty, defamation, and malicious abuse of process. Bill alleged that Katherine had (1) committed fraud by inducing him to quitclaim his home to her; (2) breached her fiduciary duty as a spouse and an attorney by forging his name on credit card applications, the car lease application, and the patent application; (3) abused process by filing false allegations in the domestic violence complaint; and (4) defamed him by filing false allegations that resulted in the department of energy's investigation. Following trial, a jury found Katherine liable on all four of Bill's tort claims and awarded Bill $197,500 in compensatory damages and $60,000 in punitive damages. Katherine appeals.

**DISCUSSION**

**1.     The Fraud Verdict Is Supported by Substantial Evidence**

**{8}** Katherine first argues that there was insufficient evidence to support the jury's finding that she committed fraud when she induced Bill to quitclaim his property to her. In order to prevail on a fraud claim, a plaintiff must prove the existence of "(1) a misrepresentation of fact, (2) either knowledge of the falsity of the representation or recklessness on the part of the party making the misrepresentation, (3) intent to deceive and to induce reliance on the misrepresentation, and (4) detrimental reliance on the misrepresentation." *Cain v. Champion Window Co. of Albuquerque*, 2007-NMCA-085, ¶ 22, 142 N.M. 209, 164 P.3d 90 (internal quotation marks and citation omitted). In support of her argument, Katherine contends that (1) her statement that Matthew would benefit from the quitclaim deed was an opinion and not an actionable statement of fact because there are a number of scenarios under which Matthew would benefit, and (2) if her statement was one of fact, she did not know that it was a misrepresentation of fact.

**{9}** In reviewing for substantial evidence, we "resolve[] all disputes of facts in favor of the successful party and indulge[] all reasonable inferences in support of the prevailing party." *McNeill v. Burlington Res. Oil & Gas Co.*, 2007-NMCA-024, ¶ 16, 141 N.M. 212, 153 P.3d 46 (filed 2006) (internal quotation marks and citation omitted), *aff'd*, 2008-NMSC-022, 143 N.M. 740, 182 P.3d 121. "The question is not whether substantial evidence exists to support the opposite result, but rather whether such evidence supports the result reached." *Id.* (internal quotation marks and citation omitted). "Substantial evidence is such relevant evidence that a reasonable mind would find adequate to support a conclusion." *Landavazo v. Sanchez*, 111 N.M. 137, 138, 802 P.2d 1283, 1284 (1990).

**{10}** Bill testified that Katherine had told him that "she was very concerned that if something [were to] happen to [him], that because the house was only in [his] name, that it was the best thing for Matthew to do this [q]uitclaim [d]eed" and that otherwise, "if

3

something were to happen to [Bill], Matthew would get nothing." Bill testified that he believed Katherine because "she's an attorney[,] she's a mortgage loan officer[,] she understands real estate[,] she understands the law, and [he] trusted her." As a result of these representations, Bill signed the quitclaim deed giving a one-half interest in his property to Katherine. Katherine denied at trial that she had told Bill that the quitclaim deed would benefit Matthew; however, she acknowledged that she had admitted making the statement at a deposition prior to trial.

### a. Katherine's Statement Was Actionable

**{11}** Katherine argues that her statement that Matthew would benefit from the quitclaim deed was an opinion, not a representation of fact, and notes that as a general rule, statements of opinion and statements regarding future events are insufficient to support an action for fraud. *Register v. Roberson Constr. Co.*, 106 N.M. 243, 245, 741 P.2d 1364, 1367 (1987). We disagree.

**{12}** Katherine relies on *Martinez v. Martinez,* 2004-NMCA-007, 135 N.M. 11, 83 P.3d 298 (filed 2003), in which the trial court specifically found that a husband's statement that a piece of property was not community property "was a statement of his opinion as to the legal status of the property, not a statement of fact." *Id.* ¶ 10. On appeal, this Court deferred to that finding but applied "a recognized exception to the general rule that misrepresentations of law are not actionable, which exception makes such misrepresentations actionable when the parties occupy a fiduciary relationship or where one party has a superior means of information." *Id.* ¶ 11 (internal quotation marks and citation omitted). Because the parties were in a fiduciary relationship at the time, the misrepresentations were actionable. *Id.* Thus, our holding in *Martinez* does not ultimately support Katherine's argument.

**{13}** Here, there is no finding that Katherine's statement was one of opinion and not of fact. However, assuming that her statement was an opinion, Katherine, like the husband in *Martinez*, made a representation regarding the legal status of the property while in a fiduciary relationship with her husband. *See In re Bivians' Estate*, 98 N.M. 722, 731, 652 P.2d 744, 753 (Ct. App. 1982) (explaining that a "fiduciary relationship between [a husband and wife] stem[s] from the marital relationship"). Specifically, she contended that the legal status of the property was such that Matthew would receive no interest in the property if Bill were to die intestate. Her misrepresentation of the legal status of the property was therefore an actionable statement.

### b. Katherine Knowingly Made a Misrepresentation of Fact

**{14}** Katherine also argues that there was insufficient evidence to support the jury's finding that she either knew that her statement that Matthew would benefit from the quitclaim deed was false or that she was reckless in making the statement. "[A]ffirmative evidence ([either] circumstantial or direct) of each element is necessary to support a finding of fraud." *Varbel v. Sandia Auto Elec.*, 1999-NMCA-112, ¶ 21, 128 N.M. 7, 988 P.2d 317. A jury is permitted to infer the requisite intent from circumstantial evidence, provided the

4

inference is reasonable. *Eckhardt v. Charter Hosp. of Albuquerque, Inc.*, 1998-NMCA-017, ¶ 56, 124 N.M. 549, 953 P.2d 722 (filed 1997).

**{15}** While there is no direct evidence that Katherine knew that the quitclaim deed would be less beneficial to Matthew than the status quo if Bill were to die intestate, there is circumstantial evidence that supports the jury's finding. At trial, while Katherine did not remember telling Bill that the quitclaim deed was in Matthew's best interest, she did not deny that she had made that statement and, in fact, she acknowledged that in her deposition she had stated that she "could have said that." When asked why, based on what she knew without looking at any statutes, the quitclaim deed would have been in Matthew's best interest, Katherine stated that she did not "know why that would be in his best interest."

**{16}** The jury could infer that Katherine either knew that her representation was untrue, since she told Bill the transfer would benefit Matthew when she did not know how it would benefit him, or that Katherine was reckless in making the statement. Notably, Katherine did not contend that she thought the statement was true when she made it, nor did she contend that Matthew would in fact have benefitted from the transfer.

**{17}** In addition, at the time that she made the statement, Katherine was employed as a mortgage loan officer and, according to Bill, Katherine understood real estate issues. Around the same time that Katherine induced Bill to sign the quitclaim deed, Katherine received information regarding the calculation of child support. Approximately four months after Bill signed the deed, Katherine obtained an appraisal of the house without Bill's knowledge or consent, and two months later, Katherine moved out of the home. Viewed in the light most favorable to the jury's verdict, the timing of these events, as well as Katherine's experience with real estate and her admission that she did not know why the deed would be in Matthew's best interest, allowed the jury reasonably to infer that Katherine knowingly misrepresented the necessity of executing the deed in order to obtain an interest in the home prior to divorcing Bill.

**2.      Spouses Are Permitted to Bring Intentional Tort Claims Against Each Other**

**{18}** Katherine next argues that this Court should vacate the entire judgment entered against her because New Mexico public policy either prohibits spouses from seeking damages for intentional torts against each other or limits interspousal tort claims to situations where the nature of the tort is sufficiently outrageous. Katherine contends that there is "well-founded New Mexico precedent" that "claims of intentional torts by one spouse against the other" should not "proceed unless sufficiently outrageous." In support of this assertion, Katherine directs us to *Hakkila v. Hakkila*, 112 N.M. 172, 812 P.2d 1320 (Ct. App. 1991), a case where we concluded that interspousal intentional infliction of emotional distress (IIED) claims must meet a higher standard than ordinary IIED claims, and *Medina v. Medina*, 2006-NMCA-042, 139 N.M. 309, 131 P.3d 696, a case where we concluded that a spouse's bigamous relationship does not allow a court to reduce that spouse's share of community property. We disagree with Katherine's assertion that these cases either preclude a spouse from bringing an intentional tort claim or limit interspousal tort claims to outrageous conduct.

5

**{19}** Our recognition in *Hakkila* that the tort of IIED should be limited in the marital context was based on three factors that are unique to both marriage and the tort of IIED itself: "(1) preventing burdensome litigation of the commonplace, (2) protecting privileged conduct and (3) avoiding groundless allegations of causation." 112 N.M. at 177, 812 P.2d at 1325. As to the first factor, we explained that "[c]onduct intentionally or recklessly causing emotional distress to one's spouse is prevalent in our society" and that "even when the conduct of feuding spouses is not particularly unusual, high emotions can readily cause an offended spouse to view the other's misconduct as 'extreme and outrageous.'" *Id.* at 176, 812 P.2d at 1324. We thus concluded that the tort must be construed narrowly to avoid transforming typical marital disputes into IIED claims. *Id.*

**{20}** With respect to the second element, we recognized that the nature of a claim of outrage "is certain to require exposure of the intimacies of married life," which would offend "the privacy interests of the defending spouse." *Id.* at 177, 812 P.2d at 1325. We explained that the risk of exposing the intimate details of the marriage differentiated IIED from other recognized intramarital torts like negligence and battery because determining fault in an automobile accident or a battery does not require a litigant to divulge the personal and intimate details of a marriage. *Id.*

**{21}** Finally, as to the third element, we explained that IIED should be limited in the marital context because of the unique nature of the injuries that must be proved to prevail on an IIED claim. Specifically, we noted that it would be difficult to determine whether a party's injuries were caused "by the outrageousness of the conduct" or by other privileged conduct such as rejection by a spouse. *Id.* We noted that such a problem does not exist with other torts like negligence or battery, where the "injuries to the other spouse can readily be tied to the tortious conduct." *Id.*

**{22}** After concluding that these three unique factors of IIED required limitation of the tort in the marital context, we noted that "[a] cautious approach to the tort of intramarital outrage also finds support in the public policy of New Mexico to avoid inquiry into what went wrong in a marriage" and that "New Mexico was the first state to provide for no-fault divorce on the ground of incompatibility." *Id.* at 177-78, 812 P.2d at 1325-26. However, the primary basis of our holding was the unique connection between the marital relationship and the tort of IIED. *Hakkila* did not, as Katherine argues, broadly hold that all intentional torts should be limited to extremely outrageous conduct. Rather, it held only that, given the unique elements that must be proved to prevail on an IIED claim, that tort must be limited in the marital context.

**{23}** Similarly, *Medina* does not stand for the proposition that an intentional tort brought by one spouse against the other must be limited to conduct that shocks the conscience of the court. *Medina* involved a husband's claim that his wife was not entitled to her share of community property upon divorce because she had engaged in bigamy following their separation. 2006-NMCA-042, ¶ 5. In holding that the wife's bigamy did not affect the distribution of the community property, we noted that "a spouse does not forfeit community property rights merely by engaging in misconduct relative to the marriage" and that "to inject an element of moral fault into the rules governing the distribution of community

6

property on divorce might be inconsistent with New Mexico's system of no-fault divorce." *Id.* ¶¶ 10, 13. We further held that while "[e]qual division of community property should be the norm even where bigamy is involved," a spouse could "be deprived of community property due to bigamy if the circumstances of the case shock the conscience of the court." *Id.* ¶ 29.

**{24}** Contrary to Katherine's assertions, *Medina* dealt solely with the effect marital misconduct has on the distribution of community property and concluded that a trial court may order an unequal distribution of community property only in a case in which it would be inequitable and violate good conscience to obtain an equal share. *Id.* ¶ 33. The present case is not analogous.

**{25}** One key element of the public policy noted in *Medina* and *Hakkila* is the concern with preventing accusations of marital misconduct and elements of private personal relationships from being brought into the courtroom. Both cases sought to prevent details regarding the breakdown of the personal relationship between the spouses from being the subject of litigation. In *Hakkila*, the IIED claim was based on conduct in the marriage that related to the marriage itself—allegations that the husband abused, insulted, berated, demeaned, and refused to engage in sexual relations with the wife. 112 N.M. at 173, 812 P.2d at 1321. Similarly, the misconduct at issue in *Medina* was the wife's marriage and cohabitation with another man while she remained married to her husband. The purpose of preventing marital misconduct from being the subject of litigation is to "remove[] fault-finding from the personal-relationship dynamics of marriage and divorce" and to avoid "dramatic courtroom accusations and counter-accusations of fault." *Vigil v. Haber*, 119 N.M. 9, 11, 888 P.2d 455, 457 (1994) (internal quotation marks and citation omitted). The focus, however, is not on barring anything that happens during a marriage from being brought before the court, but instead on preventing those things that led to the breakdown of the marriage from being considered in the distribution of community property or in a tort claim. *See Hakkila*, 112 N.M. at 178, 812 P.2d at 1326. In other words, the public policy applied in *Hakkila* and *Medina* represents a concern that the reasons a relationship ends would become the subject of litigation as both parties accuse each other of causing the dissolution of the marriage.

**{26}** Here, in contrast, the types of claims that Bill has asserted do not involve misconduct within the confines of the marriage such as unfaithfulness or demeaning and insulting behavior stemming from the marital relationship. Therefore, there was little risk that the reasons for the dissolution of Bill and Katherine's marriage would become the subject of the litigation. Instead, the claims that Bill recovered for—fraud, breach of fiduciary duty, defamation, and malicious abuse of process—are types of misconduct that, while they happened to occur during the course of a marriage, are unrelated to the marital relationship itself. Resolution of the tort claims did not require the court to delve into the intimate details of the parties' marriage or the reasons for its dissolution. Bill's fraud claim, for example, dealt solely with the economic damages Bill suffered as a result of Katherine's misrepresentation regarding Matthew's interest in Bill's property. The breach of fiduciary duty claim involved allegations that Katherine obtained a vehicle in Bill's name without his knowledge or permission, registered a patent in her name using Bill's intellectual property,

and surreptitiously obtained credit cards to Bill's detriment. The malicious abuse of process claim stemmed from Katherine's accusation that Bill had threatened to kill Katherine's mother and her initiation of a domestic violence complaint, and the defamation claim involved a report Katherine had made to the inspector general that Bill was misusing government property at his workplace.

**{27}** None of these claims involve accusations of marital misconduct, the details of Bill's personal relationship with Katherine, or issues regarding who was at fault for the dissolution of their marriage. Indeed, Katherine's actions that formed the basis of the defamation and malicious abuse of process claims occurred well after Katherine had already left the home while the divorce was already pending. While Katherine's conduct that led to the fraud and breach of fiduciary duty claims occurred during the course of the marriage, this conduct was not alleged to have had anything to do with the reasons that Katherine left the marriage, and the evidence Bill introduced to prove these claims did not delve into any personal details of his relationship with Katherine.

**{28}** Because the claims Bill asserted do not implicate any of the unique concerns that caused us to limit intramarital IIED claims and because they do not require scrutiny of the breakdown of his marital relationship with Katherine, we decline to interpret the holdings in *Hakkila* or *Medina* so broadly as to preclude or limit Bill's tort claims. We therefore apply the general rule that spouses are permitted to sue each other for intentional torts and reject Katherine's assertion that we must vacate the judgment entered against her. *See Flores v. Flores*, 84 N.M. 601, 602, 604, 506 P.2d 345, 346, 348 (Ct. App. 1973) (holding that "one spouse may sue the other for intentional torts").

### 3. Katherine Failed to Preserve Her Argument That the Tort Claims Should Have Been Consolidated With the Divorce Proceedings

**{29}** Katherine finally argues that if spouses are able to bring intentional torts against one another, those claims must be consolidated with any pending divorce proceedings. In response, Bill contends that Katherine failed to preserve this argument. We agree.

**{30}** Prior to trial, Katherine filed a motion to consolidate, arguing that all of the matters alleged by Bill's complaint occurred in the course of the marriage and that the case should therefore be consolidated with the pending divorce case. According to Bill, Katherine withdrew this motion at a September 26, 2006, hearing and stipulated to the court's jurisdiction to adjudicate Bill's tort claims separate from the divorce case. In response to this assertion, Katherine does not dispute that she withdrew her motion at the September 26 hearing. However, she contends that she preserved her argument by filing a post-trial motion in which she argued that the divorce and tort proceedings should have been joined and that she "did not stipulate that intentional tort actions . . . may [be] brought outside the context of divorce litigation."

**{31}** The record on appeal contains no transcript of the September 26 hearing, but Katherine does not dispute that she withdrew her motion for consolidation at that hearing. As a result, Katherine waived any objection she had to the litigation of Bill's claims in a

8

proceeding separate from the divorce case. *See State v. Varela*, 1999-NMSC-045, ¶ 25, 128 N.M. 454, 993 P.2d 1280 (explaining that in order to preserve an issue for appeal, a party must make a timely objection that specifically apprises the trial court of the nature of the claimed error and invokes an intelligent ruling thereon). Furthermore, Katherine's post-trial motion came too late for the trial court to correct any alleged error in allowing the separate proceeding on Bill's tort claims. *See Goodloe v. Bookout*, 1999-NMCA-061, ¶ 13, 127 N.M. 327, 980 P.2d 652 ("Raising the matter in their motion for a new trial came too late; objections must be raised in time for the trial judge to correct the error to prevent prejudice.").

**{32}** Katherine contends that even if she failed to preserve her claim, we should nonetheless address it under the public policy exception to our preservation requirement. While preservation of an issue below is generally required for an appellate court to address an issue, we can address an unpreserved issue if resolution of that issue "is likely to settle a question of law affecting the public at large or a great number of cases and litigants in the near future." *Azar v. Prudential Ins. Co. of Am.*, 2003-NMCA-062, ¶ 28, 133 N.M. 669, 68 P.3d 909. We decline to apply the exception here, where Katherine invited the error by withdrawing her pre-trial motion. *See State v. Handa*, 120 N.M. 38, 46, 897 P.2d 225, 233 (Ct. App. 1995) (noting that the doctrine of fundamental error, another exception to our preservation requirement, "has no application in cases where the defendant, by his own actions, invites error").

**CONCLUSION**

**{33}** For the foregoing reasons, we affirm the judgment entered against Katherine.

**{34}** **IT IS SO ORDERED.**

_____
**CYNTHIA A. FRY, Chief Judge**

**WE CONCUR:**

_____
**MICHAEL D. BUSTAMANTE, Judge**

_____
**LINDA M. VANZI, Judge**

**Topic Index for *Papatheofanis v. Allen*, No. 28,079**

| AE | APPEAL AND ERROR |
|----|------------------|
| AE-PA | Preservation of Issues for Appeal |
| AE-SB | Substantial or Sufficient Evidence |
| | |
| DR | DOMESTIC RELATIONS |

| | |
|---|---|
| DR-DR | Domestic Relations, General |
| | |
| PR | PROPERTY |
| PR-FD | Fiduciary Duty |
| PR-FR | Fraud |
| PR-QU | Quitclaim |
| | |
| TR | TORTS |
| TR-DF | Defamation |
| TR-FR | Fraud |
| TR-IT | Intentional Torts |
| TR-MA | Malicious Abuse of Process |