# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2023-NMCA-020

Filing Date: December 15, 2022

No. A-1-CA-39080

AQUIFER SCIENCE, LLC,

      Applicant-Appellant/Appellant,

v.

SCOTT A. VERHINES, New Mexico State
Engineer,

      Appellee/Appellee,

and

COUNTY OF BERNALILLO; HERMOSILLA
ESTATES NEIGHBORHOOD ASSOCIATION;
INTERMOUNTAIN CONSERVATION TRUST;
OLD SANDIA PARK SERVICE COOPERATIVE;
PONDEROSA RANCH ESTATES LANDOWNERS,
INC.; SAN PEDRO CREEK ESTATES
HOMEOWNERS ASSOCIATION; WILDFLOWER
NEIGHBORHOOD ASSOCIATION; CHARLOTTE
ABBINK; RUSSELL ABBINK; REBECCA
ALZHEIMER; ROSEMARY AMSPAUGH; ROD
BAKER; STEVAN BARON; CARYL BARON;
SCOTT BARRON; DAVID A. BENSON; NANCY
C. BENSON; PHYLLIS BERGMAN; RONALD P.
BOHANNAN; THOMAS P. BOYCE; NATHANEAL
BROWN; CAROLYN K. BRYAN; GEORGE T.
BRYAN; PEGGY M. BRYAN; DEE BUTLER;
WILLIAM I. BUTLER JR.; DON CAIN; MARIE
CAIN; MIKE CAMP; JACK CAMPBELL; DON
CARNICOM; MINA CARNICOM; MARGARET M.
CARROLL; TOM CHRISTENSEN; MICHAEL
COOK; JOSEPH A. COOPER; KATHY G. COOPER;
BETH CORWIN; MARIA V. CUNNINGHAM; JOEL
DARNOLD; LISA DARNOLD; BARBARA DAVID;
RICHARD DAVIS; DARIELLE DEXHEIMER;
RICHARD A. DUNN; SUSAN GIAMBATTISTA;

DALE W. GUNN; MARK GUNTER; JAMES T. HANLON; KATHLEEN A. HANLON; REBECCA S. HARTLEY; KAREN C. HAWORTH; MICHAEL D. HAWORTH; JOHN F. HAYES; LYNN HENRICKSON; BARBARA S. HERRINGTON; JOANNE HILTON; DAVID J. HOLCOMB; BRADLEY C. HOSMER; ZITA HOSMER; TRACEE HUDSON; LARRY ILFELD; CURTIS JOHNSON; PATTI JONES; REESE JONES; DALE KENNEDY; CHARLES KING; ARNOLD G. KLEIN; THEODORE I. LAMBERT; MARY A. LARAIA; MARLYS LESLEY; PATRICK LESLEY; NANCY A. LOGAN; ROBERT M. LOPEZ; FRANCES LUSSO; JAMES E. MALLINSON; MARILYN H. MALLINSON; MARK MANZUTTO; RONALD E. MASSIE; BARBARA MCCARTY; RONALD MCCARTY; KATHY MCCOY; ARJAN MELWANI; SHARMILA MELWANI; PAULA MICHEL; TOM MICHEL; JAMES MILDREN; VENESEE MILDREN; DOROTHY MITCHELL; KERRY MOLNAR; PETER MOLNAR; ANDREW J. MOONEY; CLIFFORD D. MORRIS; GAYLE J. MORRIS; LORNA MORROW; PAUL MORROW; JIM MULLANY; MARJORIE MULLANY; G. MARK NAYLOR; TINA NENOFF; ERIN O'NEIL; JACK O'NEIL; JACQUELINE ORR; JOHN ORR; JERRY PAGE; KAREN PAGE a/k/a KAREN WALKER; ANDREE PEEK; DOUG PEEK; HANS PETERSEN; MARK PICKERING; SUSAN PICKERING; SYLVIA PIERCE; RICHARD RAGLE; DAN R. RICHEY; JUDITH B. RICHEY; KATRINA RIVERS; DAVID J. ROESCH; DOUG SALMI; KAREN SALMI; CAROL SANDERS-REED; JOHN N. SANDERS-REED; REBECCA SCHNELKER; JILL SCHUMACHER; DONNA SCHUYLER; RICHARD SCHUYLER; JULIE LYNCH SEIMERS; BARRY SILBAUGH; CAROLYN J. SIMMONS; JERRY A. SIMMONS; SUE ANN SLATES; ANTOINETTE SMITH; ROBERT SMITH; VERA SPRUNT; ELAINE M. STEPHENS; ANNE STRADER; JO ELISE TABACCHI; MARGARET BURGES TAYLOR; ROBERT K. TAYLOR; JONATHAN THOMAS; DAVID E. THOMPSON; BRIAN TYREE; OVIDIU VIORICA; BIRUTE WATSON; SAUL BARRY WAX; DAVID WEAVER; ALBERT WEBB; DENISE WEBB; ANGELA WELFORD; DAVID W. WENTWORTH; JEANNE S. WENTWORTH; TIM WILLIS; JANET WINCHESTER-SILBAUGH; JAN WISTE; CAROL J. WOOD; JAMES A. WOOD; JAN WRIGHT; and MARY ANN ZANNER,

Protestants-Appellees/Appellees.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Clay Campbell, District Judge**

Hinkle Shanor LLP
Julie A. Sakura
Dioscoro A. Blanco
Santa Fe, NM

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Edward Ricco
Albuquerque, NM

for Appellant

Jalbright Law, LLC
Jeffrey H. Albright
Albuquerque, NM

for Appellee County of Bernalillo

Paul Hultin
Santa Fe, NM

New Mexico Environmental Law Center
Maslyn Locke
Santa Fe, NM

Durham, Pittard & Spalding, LLP
Caren I. Friedman
Rosalind B. Bienvenu
Justin R. Kaufman
Santa Fe, NM

for Appellees San Pedro Creek Estates Homeowners Association, Old Sandia Park
Service Cooperative, Rosemary Amspaugh, Caryl Baron, Phyllis Bergman, Nathaneal
Brown, Anne Strader, Carolyn K. Bryan, Margaret M. Carroll, Tom Christensen, Joanne
Hilton, Beth Corwin, Richard Davis, Barbara Davis, Barbara S. Herrington, David J.
Holcomb, Kathy McCoy, Dale Kennedy, Charles King, Karen Salmi, Marlyss Lesley,
Frances Lusso, David Weaver, Jim Mullany, Marjorie Mullany, Jerry Page, Ricard
Ragle, Doug Salmi, Carol Sanders-Reed, Julie Lynch Seimers, Barry Silbaugh, Janet
Winchester-Silbaugh, Carolyn J. Simmons, Jerry A. Simmons, Sue Ann Slates, Robert
Smith, Antoinette Smith, and Jan Wiste

**OPINION**

**BUSTAMANTE, Judge, retired, sitting by designation.**

**{1}**     Appellant Aquifer Science, LLC (Aquifer Science) appeals the district court's judgment denying its request to appropriate water from the Sandia Underground Water Basin (Sandia Basin). Aquifer Science argues that (1) the district court's analysis of impairment to existing water rights was incomplete under guidelines promulgated by the State Engineer (the Guidelines)[1] and not supported by substantial evidence; (2) the district court applied an unduly strict interpretation of the concept of "conservation of water" as used in NMSA 1978, Section 72-12-3(E) (2001, amended 2019);[2] and (3) the district court improperly required Aquifer Science to obtain land-use authorization for the entire project as a condition for approval of its request to appropriate water.

**{2}**     Aquifer Science also appeals the district court's order granting costs to certain protesting parties as the prevailing parties below, arguing that (1) the cost bill submitted did not comply with the requirements of Rule 1-054(D)(4) NMRA; (2) the district court abused its discretion when it did not provide Aquifer Science additional time to lodge specific objections to the bill of costs; and (3) as a matter of law, post-judgment interest cannot be imposed on an award of costs. We affirm.

## BACKGROUND

**{3}**     Aquifer Science is a Nevada-based limited liability company formed to obtain water for the Campbell Ranch Master Plan Project (Master Plan). The Master Plan is spread among Bernalillo County, Sandoval County, and Santa Fe County, north of the Town of Edgewood (Edgewood). The Master Plan envisions a multiple use development consisting of four villages with residential, commercial, and resort elements, including two golf courses and some 3,000 acres of open space. Edgewood has approved the Master Plan and annexed Villages 2, 3, and 4. Edgewood did not annex Village 1 located on the west side of Highway 14. As a result, Village 1 remains subject to the planning jurisdiction of Bernalillo County. Bernalillo County has neither approved the Master Plan nor annexed Village 1.

**{4}**     Aquifer Science filed its first application with the State Engineer in June 2009 seeking a permit to appropriate 1,500 acre-feet per year (afy) of ground water on 25,000 acres of land. In September 2011, Aquifer Science amended its application to reduce its request to 1,010 afy of water. In March 2013, Aquifer Science amended its application to reduce the geographic area of use down to approximately 8,000 acres of land. And, in June 2013, it again amended its application to reduce its requested appropriation to 717 afy. Following a two-week hearing, the State Engineer denied the application because there was no unappropriated groundwater in the Sandia Basin to satisfy Aquifer Science's request. After the application was denied, Aquifer Science filed a de novo appeal in the district court pursuant to NMSA 1978, Section 72-7-1(E) (1971).

---

1The district court's determination and the parties' arguments regarding impairment are based on the Guidelines. See Tom Morrison, N.M. Office of the State Engineer, *Guidelines for the Assessment of Drawdown Estimates*, Hydrology Bureau Report 06-01 at 1-3 (2006).
2All references to Section 72-12-3 in this opinion are to the 2001 version of the statute.

**{5}** The district court allowed Aquifer Science to amend its application to further reduce its requested appropriation to 350 afy (the Application). Aquifer Science requested the amendment because it had acquired other permitted water. Following the amendment, the State Engineer reversed its position and aligned itself with Aquifer Science's position on all of the issues. Despite the State Engineer's change of position, the Application was opposed by several parties, including individuals and entities represented by the New Mexico Environmental Law Center (collectively, Protestants), Bernalillo County, and numerous pro se parties. Following a two-week bench trial, the district court denied the Application. The district court determined that, although there was water to appropriate, the Application was denied "as being inconsistent with applicable principles of conservation and because the magnitude of the likely impairment to existing water rights [was] significant."

**{6}** Protestants filed a bill of costs to which Aquifer Science objected. After a hearing on the objections and other matters, the district court substantially granted the costs requested by Protestants, and granted post-judgment interest on the award of costs.

## DISCUSSION

**{7}** We start by addressing Aquifer Science's arguments relating to the Application and then turn to issues regarding costs.

## I. Aquifer Science's Application for the Appropriation of Water Rights in the Sandia Basin

**{8}** "The unappropriated water of every natural stream, perennial or torrential, within the state of New Mexico, is hereby declared to belong to the public," and our public waters are "subject to appropriation for beneficial use" in accordance with state law. N.M. Const. art. XVI, §§ 2, 3. Our Legislature has enacted a comprehensive Water Code governing the appropriation of water. NMSA 1978, §§ 72-1-1 to 72-20-103 (1876, as amended through 2021). Section 72-1-2 provides that "[b]eneficial use [of water] shall be the basis, the measure and the limit of the right to the use of water." *See* § 72-12-2 (stating the same for underground waters).

**{9}** The State Engineer exercises administrative control over a particular groundwater basin by declaring it and defining its boundaries. Section 72-12-1. Because the Sandia Basin is a declared basin, Aquifer Science had to apply for a permit to appropriate water. *See* §§ 72-12-20, -3(A). In determining whether to issue a permit, the State Engineer considers an applicant's application and grants it if it "finds that there are . . . unappropriated waters" and that the proposed appropriation (1) "would not impair existing water rights from the source," (2) "is not contrary to conservation of water within the state," and (3) "is not detrimental to the public welfare of the state." Section 72-12-3(E). At issue in this appeal are the first and second factors—impairment and conservation.

## A. Impairment

**{10}** "In order to evaluate impairment of existing rights, the [s]tate [e]ngineer must assess whether the contemplated action will have an adverse effect on any prior appropriation." *Tri-State Generation v. D'Antonio*, 2011-NMCA-015, ¶ 13, 149 N.M. 394, 249 P.3d 932, *rev'd on other grounds*, 2012-NMSC-039, 289 P.3d 1232. Citing *Montgomery v. Lomos Altos, Inc.*, 2007-NMSC-002, ¶ 21, 141 N.M. 21, 150 P.3d 971, the district court appropriately noted that "[w]hether an application impairs existing water rights is a fact driven inquiry." In *Montgomery*, our Supreme Court emphasized that it had not and would not attempt to formulate a per se definition of impairment of existing water rights. *Id.* ¶¶ 21-24. Rather, it reaffirmed that "the individual facts of each case may require different resolutions of impairment questions." *Id.* ¶ 24. As such, in some circumstances, lowering of the water table would not necessarily result in an impairment. *Id.* ¶ 22. In other situations, a de minimis depletion might give rise to a finding of impairment. *Id.*

**{11}** The district court and our Supreme Court could also have noted that the fact driven nature of the inquiry is necessitated by the circumstance that the State Engineer has not promulgated any rules or regulations regarding impairment and there is no statutory definition of impairment. Nonetheless, the State Engineer does not approach impairment analysis in a vacuum. It first issued a set of guideline documents to direct the impairment assessment in 2006—the Guidelines. The State Engineer issued updated guidelines in 2016 and 2017, but the Guidelines were used in this case because they were in existence when the Application was first filed. Tom Morrison, N.M. Office of the State Engineer, *Guidelines for the Assessment of Drawdown Estimates*, Hydrology Bureau Report 16-03 (2016); Tom Morrison, N.M. Office of the State Engineer, *Guidelines for the Assessment of Drawdown Estimates*, Hydrology Bureau Report 05-17 (2017).

**{12}** In relevant part, the Guidelines provide criteria for evaluating, typically over a forty-year period, the physical and economic impacts of a groundwater application on existing wells. Morrison, *supra*, at 1-4. The purpose of the Guidelines "is to provide guidelines for the assessment of degree of hardship that will result from drawdown caused by a proposed groundwater diversion." *Id.* at 1 (footnote omitted). The Guidelines acknowledge that diversions will generally cause some degree of water level decline, but will result in a material physical hardship when they affect the ability of nearby wells to produce the quantity of water required for their uses. *Id.* The Guidelines note that "[f]lexibility in applying the guidelines is necessary due to unique well characteristics and hydrologic conditions." *Id.* Aquifer Science's and the State Engineer's experts both agreed that the Guidelines give decision makers flexibility, discretion, and the ability to make judgment calls in applying their concepts.

**{13}** To analyze whether a new diversion may result in a hardship—or its synonym, impairment—the Guidelines first suggest selecting "the allowable water level decline existing wells may tolerate." *Id.* The Guidelines then suggest estimating the "pumping water level at which the required well yield cannot be physically sustained." *Id.* This estimate is determined by "well construction, aquifer conditions, and pump characteristics." *Id.* "By comparing the total [estimated] drawdown to allowable

drawdowns, an assessment of the degree of impact is made." *Id.* "Physical hardship is the loss of the required well yield due to excessive water level decline." *Id.* at 3.

**{14}**     As of 2006 the State Engineer had selected presumptive drawdown allowances for a few of the declared basins in the state. *Id.* at 4-5. For example, a drawdown allowance of ten feet was selected for thick alluvial aquifers, such as the Middle Rio Grande Basin. *Id.* at 4. The Guidelines state that the same ten-foot allowance "may be selected . . . for wells in other basins with similar hydrologic conditions." *Id.* A four-foot drawdown allowance was selected for the Estancia and Tularosa areas. *Id.* In comparison, a two-foot drawdown allowance was permitted for thin alluvial aquifers, such as basins in southeastern New Mexico. *Id.* at 4-5. The State Engineer has not adopted a drawdown allowance for the Sandia Basin. *See id.*

**{15}**     The experts for Aquifer Science, the State Engineer, and Protestants all agreed the Sandia Basin is not a thick alluvial aquifer. Despite this, the experts for Aquifer Science and the State Engineer applied the ten-foot drawdown allowance for a thick alluvial aquifer and, based on that standard, opined that only eleven or twelve wells would be impacted by Aquifer Science's proposed pumping. *See id.* at 4. The district court rejected that approach and, agreeing with Protestants' expert, determined that the Application would impair as many as 100 wells. This determination led the district court to conclude that the "Application is denied because the magnitude of the impairment to existing water rights is significant."

**{16}**     On appeal, Aquifer Science makes two arguments regarding impairment. First, it asserts that the district court did not conduct a full analysis of impairment to existing water rights under the Guidelines because it failed to consider whether the Sandia Basin had "similar hydrologic conditions" to a basin with a thick alluvial aquifer. *See id.* Second, it obliquely asserts that substantial evidence does not support the district court's finding that, based on the 2006 Guidelines, up to 100 wells would be impaired by the Application. We address each of Aquifer Science's arguments regarding impairment in turn.

**1.     Aquifer Science's Argument Regarding the District Court's Failure to Assess Whether the Sandia Basin Has Similar Hydrologic Conditions to the Middle Rio Grande Basin Was Not Preserved**

**{17}**     Aquifer Science argues that though the parties agreed the Sandia Basin is not a thick alluvial aquifer, the district court erred in not analyzing whether it has "similar hydrologic conditions" to a thick alluvial basin when deciding which drawdown allowance to use to assess impairment. *See id.*

**{18}**     Aquifer Science candidly admits that it did not preserve this argument. But, it argues an exception to the preservation requirement applies because the district court was aware that the Guidelines allow the use of the same drawdown allowance for thick alluvial aquifers and aquifers with "similar hydrologic conditions." *See id.* Aquifer Science points us to an exchange during the testimony of Protestants' expert to

illustrate its contention. The expert was asked to read from the Guidelines. The expert misread the second sentence of the material, and the district court pointed out that he had elided the word "hydrologic" in the phrase "[t]his administrative drawdown allowance may be selected for wells within the [Middle Rio Grande Basin] or for wells in other basins with similar hydrologic conditions." *Id.* Aquifer Science relies on *State v. Conn*, 1992-NMCA-052, ¶ 11, 115 N.M. 101, 847 P.2d 746, for the proposition that it is not necessary to call the district court's attention to a point when the record indicates that the court already was aware of it. We disagree.

{19}    Aquifer Science all but ignores the nature and extent of its failure to preserve the argument it makes on appeal. It faults the district court for failing to undertake a technical, fact intensive inquiry even though Aquifer Science's requested findings of fact and conclusions of law do not mention or refer to the concept of "similar hydrologic conditions." In addition, Aquifer Science's requested findings of fact do not refer to any testimony explaining in context why the Sandia Basin has "similar hydrologic conditions." This basic failure to explicate a technically difficult concept, coupled with a failure to request a finding on what was clearly a fundamental issue in the case, is of a different order than the simple failure to be more specific in the evidentiary objection discussed in *Conn. See id.* Because the issue involves a fundamental matter pivotal to Aquifer Science's theory of its case, preservation concepts require a showing "that appellant fairly invoked a ruling of the [district] court on the same grounds argued in the appellate court." *Benz v. Town Ctr. Land, LLC*, 2013-NMCA-111, ¶ 24, 314 P.3d 688 (internal quotation marks and citation omitted); *see* Rule 12-321(A) NMRA.

{20}    Based on our review, the district court was not sufficiently alerted to the fact that Aquifer Science or the State Engineer believed the Sandia Basin had similar hydrologic conditions to a thick alluvial aquifer. The State Engineer argued that although the Sandia Basin does not have a thick alluvial aquifer, it was appropriate to apply the ten-foot allowance because "the basin is not closed to new appropriations and because the best aquifer exists at depths of a thousand feet and wells have been successfully deepened in the basin." This argument did not invoke the "similar hydrologic conditions" language from the Guidelines, nor does the context express that the Sandia Basin has similar hydrologic conditions to a thick alluvial aquifer such that the ten-foot drawdown allowance should be applied. *See* Morrison, *supra*, at 4. And, neither Aquifer Science nor the State Engineer filed a motion for reconsideration after receiving the district court's findings and conclusions. Thus, the district court was never alerted to the assertion that the ten-foot drawdown allowance was based on this reasoning, Protestants and the other parties were not provided a fair opportunity to respond, and this Court has an insufficient record to review the issue. The issue was not preserved, and we decline to address Aquifer Science's argument.

## 2.    The District Court's Determination That as Many as 100 Wells Would Be Impaired Is Supported by Substantial Evidence

{21}    As noted above, Aquifer Science asserts, as part of its argument concerning similar hydrologic conditions, that there is no evidence to support the district court's

determination that "the Application will impair as many as 100 wells." Though made as part of the unpreserved argument we have refused to address, the assertion, which was preserved, can be seen to stand on its own. We, thus, opt to address it.

**{22}** Substantial evidence is relevant evidence that a reasonable mind would find adequate to support a conclusion. *State ex rel. King v. B & B Inv. Grp., Inc.*, 2014-NMSC-024, ¶ 12, 329 P.3d 658. "When considering a claim of insufficiency of the evidence, the appellate court resolves all disputes of facts in favor of the successful party and indulges all reasonable inferences in support of the prevailing party." *N.M. Mil. Inst. v. NMMI Alumni Ass'n, Inc.*, 2019-NMCA-008, ¶ 19, 458 P.3d 434 (alteration, internal quotation marks, and citation omitted).

**{23}** The district court rejected Aquifer Science's and the State Engineer's experts' decision to apply a ten-foot drawdown allowance to assess impairment. Citing the testimony of Protestants' expert, Paul Davis, the district court's finding of fact No. 193 specifically notes that "as many as 100 wells would be identified as impaired" under the Guidelines "by eliminating use of the 10-foot drawdown."

**{24}** The gist of Mr. Davis's testimony was that—accepting Aquifer Science's pumping test and its drawdown model in toto, and applying the Guidelines consistently—100 domestic wells would be impaired. Mr. Davis testified that the Sandia Basin was not a thick alluvial basin and as such it was improper to apply the ten-foot drawdown allowance applicable to basins such as the Middle Rio Grande. By eliminating the ten-foot allowance as a criteria and including wells that were likely to fail even without the Application's proposed pumping, the number of wells impacted rose to approximately 100 as depicted on Protestants' Exhibit 93.

**{25}** The district court was presented with divergent expert opinions as to how the Guidelines should be applied in the context of the Sandia Basin. The experts' opinions were all received into evidence without objection. As the fact-finder, the district court was free to resolve conflicts in the evidence and choose among the various opinions offered. *See Las Cruces Pro. Fire Fighters v. City of Las Cruces*, 1997-NMCA-044, ¶ 12, 123 N.M 329, 940 P.2d 177; *Skeen v. Boyles*, 2009-NMCA-080, ¶ 37, 146 N.M. 627, 213 P.3d 531. We will not reweigh the evidence nor substitute our judgment for that of the fact-finder.

**{26}** Aquifer Science emphasizes that in conclusion of law No. 21, the district court stated that "[t]he correct application of the . . . Guidelines requires an allowable 40-year drawdown of two feet." Aquifer Science correctly points out that Mr. Davis did not apply the two-foot drawdown allowance for thin alluvial formations to support his opinion because, he testified, the Sandia Basin is not alluvial. *See* Morrison, *supra*, at 4-5 (noting the two-foot drawdown applies to basins with thin alluvial aquifers). To that extent, the district court's conclusion that Mr. Davis used a two-foot drawdown allowance is incorrect. The question is whether that error undermines the district court's reliance on Mr. Davis's opinion and its rejection of the other expert's testimony. We conclude that it does not.

**{27}** Recognizing the primacy of the fact-finder with regard to determining the operative factual context of matters before it, appellate courts construe findings of the district court so as to uphold a judgment rather than to reverse it. *Bishop v. Evangelical Good Samaritan Soc'y*, 2009-NMSC-036, ¶ 25, 146 N.M. 473, 212 P.3d 361. In keeping with appellate courts' preference to indulge all reasonable inferences in support of the district court's decision, this Court adheres to the concept that specific findings of fact supported by substantial evidence will prevail over any inconsistent conclusions of law. *Roybal v. Chavez Concrete & Excavation Contractors, Inc.*, 1985-NMCA-020, ¶¶ 8-9, 102 N.M. 428, 696 P.2d 1021; *In Re Will of Carson*, 1974-NMSC-097, ¶¶ 7-8, 87 N.M. 43, 529 P.2d 269.

**{28}** In cases such as *Roybal* and *Carson*, the disagreement between the findings of fact and conclusions of law required reversal to conform the conclusion to the accepted facts. *Roybal*, 1985-NMCA-020, ¶¶ 8-9; *Carson*, 1974-NMSC-097, ¶¶ 7-8. In *Roybal*, for example, this Court reversed after the district court granted greater compensation than was supported by its findings concerning the extent of the worker's injuries. 1985-NMCA-020, ¶¶ 10-12. Reversal is not required here because Mr. Davis's opinion that 100 wells would be impaired is not dependent on applying a two-foot drawdown allowance. The district court's inclusion of a two-foot allowance is thus surplusage, which can be excised without altering the fundamental agreement between the district court's decision and the testimony it credited.

## B.     Conservation

**{29}** Aquifer Science argues that the district court adopted an unduly strict interpretation of Section 72-12-3(E) when it concluded that the Application "is not consistent with conservation." Aquifer Science again alerts us to a potential preservation problem with this issue by noting that the arguments made on appeal can be seen as "more developed . . . than that presented to the district court." Our review of the record confirms that construction of Section 72-12-3(E) below was not the focus of the parties' attention prior to the district court's entry of its findings of fact and conclusions of law. And, similar to the impairment issue, Aquifer Science did not file a motion to reconsider after it received the district court's ruling. In this instance, however, we agree that the lack of argument below should not prevent us from addressing the issue, both because management of New Mexico's water is increasingly a matter of general public interest, *see* Rule 12-321(B)(2)(a), and because construction of the statute is not a fact-dependent inquiry. In addition, given that there are no New Mexico cases discussing the conservation prong of Section 72-12-3(E), we deem it appropriate to provide guidance as to its meaning and application.

**{30}** Construction of statutes presents a legal question that we review de novo. *Cooper v. Chevron U.S.A., Inc.*, 2002-NMSC-020, ¶ 16, 132 N.M. 382, 49 P.3d 61.

**{31}** Aquifer Science starts its argument by noting that the district court's conclusion of law No. 45 denied the Application because "it is not consistent with conservation," while Section 72-12-3(E) requires that Aquifer Science demonstrate that its request "is not

contrary to conservation of water within the state." Aquifer Science asserts that the district court's "erroneous phrasing of the relevant inquiry" indicates a basic misunderstanding of the statutory standard in that it imposed an affirmative burden of proof not found in the statute. Aquifer Science then undertakes to construe the statute, and applying its interpretation of the statute, reviews the evidence it submitted at trial to demonstrate how it met its burden.

**{32}** We first consider whether the district court's terminology is substantively significant. We then proceed to construe Section 72-12-3(E). Finally, we review the evidence to determine whether it supports the district court's decision.

**1.       The District Court's Choice of Terminology Was Not Erroneous**

**{33}** Aquifer Science ascribes more import to the district court's choice of words in its conclusion of law No. 45 than it merits. We conclude that, in context, the phrase "not consistent with conservation" is no more than a synonym for the statutory phrase "not contrary to conservation of water." *See id.* First, we note that the district court quoted the statutory language in its conclusion of law No. 7. It was thus clearly aware of the statute and its requirements.

**{34}** Second, the parties themselves did not use the statutory phrase. For example, in its post-trial proposed conclusions of law, Aquifer Science asked the district court to conclude that approval of the Application was "contingent upon determinations regarding whether . . . the [A]pplication [would] . . . be contrary to the conservation of water in the state." Aquifer Science's phrasing of its burden matches the phrasing used by the State Engineer during its proceedings. It is also the phrasing used by Aquifer Science in its motion to establish the nature and scope of de novo appeal. And, the district court adopted the phrasing in its letter order granting Aquifer Science's motion.

**{35}** Third, we agree with Protestants that Aquifer Science's argument amounts to no more than semantic gymnastics. Framed in the negative, Section 72-12-3(E) allows an application to be granted if it is not contrary to conservation. As Protestants note, "a court could conclude that an application . . . is 'not *not* contrary to conversation,' or, to avoid the double negative, it is contrary to conservation." Being contrary to conservation is functionally synonymous with the district court's phrase "not consistent with conservation." Stated more simply, the district court's mere usage of nonidentical terminology as that found in the statutory phrase does not suggest its misunderstanding of the applicable standard. *Cf. Wild Horse Observer's Ass'n, Inc. v. N.M. Livestock Bd.*, 2022-NMCA-061, ¶ 34, 519 P.3d 74 (stating that a district court's use of "differing descriptive nomenclature" did not "render[] its injunction impracticable to implement").

**{36}** Appellate courts operate under a presumption of correctness of the district court's rulings. *Farmers, Inc. v. Dal Mach. & Fabricating, Inc.*, 1990-NMSC-100, ¶ 8, 111 N.M. 6, 800 P.2d 1063. "[T]he burden is on the appellant to clearly demonstrate that the district court erred." *Corona v. Corona*, 2014-NMCA-071, ¶ 26, 329 P.3d 701. The

foregoing analysis demonstrates that Aquifer Science has failed to demonstrate that the district court misunderstood the statutory standard it was applying.

## 2. Aquifer Science's Interpretation of Section 72-12-3(E) Is Not Workable

**{37}** Ostensibly using a plain language approach to statutory interpretation, Aquifer Science construes Section 72-12-3(E) to mean that "an application to appropriate groundwater is 'not contrary to conservation' as long as the proposed use is beneficial and no more water is appropriated than is needed to achieve the beneficial purpose." It arrives at this interpretation by combining language from cases addressing issues unrelated to the concerns of conservation with a dictionary definition of the word "conserve." The result is a standard that could improperly prevent the State Engineer and the courts from considering evidence other than an applicant's best efforts evidence.

**{38}** First, Aquifer Science quotes from *State ex rel. Reynolds v. South Springs Co.*, 1969-NMSC-023, ¶ 15, 80 N.M. 144, 452 P.2d 478, to the effect that New Mexico's water laws are "intended to encourage use and discourage nonuse or waste." *Reynolds*, in turn, cited *Yeo v. Tweedy*, 1929-NMSC-033, 34 N.M. 611, 286 P. 970, for the proposition. *Reynolds*, 1969-NMSC-023, ¶ 15. Neither case involved an issue remotely related to the concept of conservation under Section 72-12-3(E). *Yeo* addressed the constitutionality of a newly enacted statute that declared underground waters to be public waters subject to the jurisdiction of the state engineer. 1929-NMSC-033, ¶¶ 1, 4, 6. *Reynolds* addressed the contours of common law abandonment of water rights and the statutory concept of forfeiture of water rights. 1969-NMSC-023, ¶¶ 3-4. Any general statements about the purpose of New Mexico's water laws found in those cases provides no guidance as to how conservation should be assessed under Section 72-12-3(E). This is particularly true given that the language making conservation part of the calculus for approving applications to divert groundwater did not appear in New Mexico's water law statutes until 1983, fourteen years after *Reynolds* and nearly fifty-five years after *Yeo*. *Compare* 1983 N.M. Laws, ch. 2, § 2, *with* 1977 N.M. Laws, ch. 134, § 3, *and* 1967 N.M. Laws, ch. 308, § 2, *and* NMSA 1953, § 75-11-3 (1931, amended 1971) (recompiled as § 72-12-3).

**{39}** Second, the definitions from *Black's Law Dictionary* and *Webster's Third New International Dictionary* of the word "conserve" that Aquifer Science relies on are similarly too limited to provide a reliable guide to what the statutory term "conservation" might mean. Aquifer Science emphasizes the concepts of minimizing use and preventing waste from the portions of the definitions it cites. But as with most complex words, meaning is context dependent. Recognizing this, the full definition of "conserve" given by *Black's Law Dictionary* is: "1. To take care of; to care for. 2. To protect from change, destruction, or depletion. 3. To reduce or minimize the use of." *Conserve*, *Black's Law Dictionary* (11th ed. 2019). The full definition of "conservation" given by *Black's Law Dictionary* is: "The supervision, management, and maintenance of natural resources such as animals, plants, forests, etc., to prevent them from being spoiled or destroyed; the protection, improvement, and use of natural resources in a way that

ensures the highest social as well as economic benefits." *Conservation*, *Black's Law Dictionary* (11th ed. 2019). The pertinent definition of "conserve" given in *Webster's Third New International Dictionary* is: "1: to keep in a safe or sound state (as by deliberate planned, or intelligent care): preserve from change or destruction: save." *Conserve*, *Webster's Third New Int'l Dictionary* (Unabridged ed. 2002). And, it's pertinent portion of the definition of "conservation" is: "1: deliberate, planned, or thoughtful preserving, guarding, or protecting: a keeping in a safe or entire state: . . . 2: care or keeping and supervision of something by a governmental authority or by a private association or business: as a: planned management of a natural resource to prevent exploitation, destruction, or neglect . . . b: the wise utilization of a natural product esp[ecially] by a manufacturer so as to prevent waste and insure future use of resources that have been depleted."

{40}    These fuller definitions include concepts of not just of minimal use and prevention of waste, but broader concerns for planned management of and caring for resources to prevent exploitation, destruction, and depletion. These broader concerns would be obvious additions to any definition of conservation as applied to water in New Mexico. Aquifer Science does not acknowledge these aspects of the concept of conservation and, thus, its approach to the construction of Section 72-12-3(E) is too narrow—and, frankly, too self-serving—to credit.

{41}    Aquifer Science's approach would not allow a full explication and consideration of facts. Its argument here demonstrates that. Aquifer Science acknowledges that evidence contrary to its position—which the district court credited and relied on—was admitted without objection at the trial below, but asserts in effect that such evidence is irrelevant because it proved that the Master Plan incorporated the most water-wise ideas and performance standards available. That incorporation by itself, it asserts, fulfilled its burden of proof regardless of the contrary evidence. This assertion highlights why Aquifer Science's proposed construction of the statute is not workable. Accepting its approach would improperly restrict the type of evidence the State Engineer and the district courts would be able to rely on.

{42}    Also, as we noted above, Section 72-1-2 and Section 72-12-2 already provide that "beneficial use" is "the basis, the measure and the limit of the right to the use of water," Aquifer Science's construction of the phrase "not contrary to conservation" to simply mean "beneficial use" would make the conservation provision superfluous—contrary to our rules of statutory construction. *See Am. Fed'n of State, Cnty. & Mun. Emps. v. City of Albuquerque*, 2013-NMCA-063, ¶ 5, 304 P.3d 443 ("Statutes must also be construed so that no part of the statute is rendered surplusage or superfluous." (internal quotation marks and citation omitted)).

{43}    Yet another indication that Aquifer Science's construction is not workable is the effect it could have on appellate review of district court decisions. The normal standard of review counsels appellate courts to defer to the trier of fact and its resolution of conflicts in testimony. *Sunnyland Farms, Inc. v. Cent. N.M. Elec. Coop., Inc.*, 2013-NMSC-017, ¶ 37, 301 P.3d 387; *Buckingham v. Ryan*, 1998-NMCA-012, ¶ 10, 124 N.M.

498, 953 P.2d 33. Aquifer Science tries to avoid this standard of review by asserting that, having met its burden of proof, the contrary evidence admitted at trial can simply be ignored. The argument is novel, but we see no reason to skew the norms of appellate review in this context. Reviewing the evidence as presented in Aquifer Science's briefing makes it clear that there is substantial evidence to support the district court's decision—the matter we turn to next.

**{44}** We will not attempt to formulate a definition of "conservation of water" ourselves. Just as our Supreme Court refused to state a bright line rule with regard to the assessment of impairment in Section 72-12-3(E), we conclude that such an effort with respect to "conservation of water" would be similarly difficult and could lead to "severe complications." *See Montgomery*, 2007-NMSC-002, ¶ 21 (quoting *Mathers v. Texaco, Inc.*, 1966-NMSC-226, ¶ 16, 77 N.M. 239, 421 P.2d 771). Just like the evaluation of impairment, assessment of conservation is of necessity a matter best dealt with on a case-by-case basis, applying the various features of the concept of conservation as needed under the set of facts presented in each case.

### 3. The District Court's Decision That the Application Was Contrary to the Conservation of Water Is Affirmed

**{45}** As noted by Aquifer Science, the district court credited it for its efforts to forecast and reduce water usage under the Master Plan. But the inquiry does not end there. As Aquifer Science admits, the district court also recognized the limits of Aquifer Science's model. It should be emphasized that Aquifer Science does not challenge the admissibility of the evidence the district court relied on, including, for example, the extensive evidence regarding the potential effects of climate change on the Master Plan's water use projections. Aquifer Science did not offer any evidence to rebut Protestants' climate change expert. And, Aquifer Science does not question the accuracy or validity of the district court's concerns and observations in this regard. It simply argues that Protestants cannot overcome its basic showing that the Master Plan incorporates the latest standards for methods of reduction of water use.

**{46}** The district court found that the predicted higher temperatures and severe droughts were likely to have a negative effect on the supply of water in the next fifty years. The district court also found that Aquifer Science did not consider the impacts of climate change in its analysis. These findings are supported by the testimony of an Aquifer Science's expert witness who admitted that he did "not directly" consider climate change in any of his assumptions about evapotranspiration. The State Engineer's expert testified that the State Engineer does not consider climate change when deciding whether to grant an application. Another of Aquifer Science's expert witnesses agreed that the State Engineer does not have any procedures to consider climate change in its evaluation of applications. The same witness opined that it would not be prudent for the State Engineer to consider climate change in its evaluation. The district court's finding of fact that Aquifer Science did not consider climate change in preparing its water demand or hydrologic analyses is supported by substantial evidence.

**{47}**    Despite this, as a matter of judicial caution, we opt not to rely on the finding regarding climate change as a basis for affirming the district court's decision regarding conservation. Our decision provides the State Engineer and the Legislature the opportunity to provide guidance regarding climate change and conservation before it is judicially imposed. Further, we can affirm the conclusion that the Application is contrary to conservation of water without relying on this evidence. We explain.

**{48}**    While Aquifer Science's projected per capita water use meets the State Engineer's Conservation Guide for Public Utilities (Conservation Guide), the district court identified a real concern that there is no way to actually enforce usage limits or compliance with the Master Plan. The State Engineer does not enforce the Conservation Guide nor does it deal with building permits. The district court foresaw concerns about Edgewood's ability to enforce the water use limits also. The district court also found that the Master Plan does not include a per capita cap on usage and Aquifer Science did not offer to condition its permit on imposition of a cap. The district court also found that the Master Plan allows the use of independent wells and septic systems, exacerbating control of usage and potentially reducing the availability of effluent to offset potable water requirements.

**{49}**    The district court found that Aquifer Science's water use projections—in particular with regard to the use of effluent to replenish lost flow in the San Pedro Creek—are dependent on a full build-out of the Master Plan. Without a full build-out of Village 1, available effluent would be reduced by 70.7 afy. The predicted reduction in San Pedro Creek flow is 102 afy. The district court was appropriately concerned about the effect of not building Village 1 on water usage and effluent production. But approval and build-out of Village 1 is "uncertain" and "speculative" given the fact that that portion of the Master Plan is under the jurisdiction of Bernalillo County, thus without such approval the predicted effluent reduction could be higher and thus contrary to the conservation of water.

**{50}**    Finally, the district court found that the planned golf courses would require 100 afy of pumped potable water for eleven-plus years into the Master Plan timeline. The district court concluded that this amount of water for golf courses was not consistent with conservation. Given the consistent general decline of well water levels in the Sandia Basin—as shown by the Bernalillo County monitoring program—this conclusion is a reasonable distillation of the evidence the district court considered.

**{51}**    Based on these considerations, the district court's decision concerning conservation is supported by the evidence. We will not reweigh the evidence, nor will we ignore it as Aquifer Science suggests we do.

**C.    The District Court Did Not Require Aquifer Science to Demonstrate It Had Land Use Authorization**

**{52}** Aquifer Science argues that the district court improperly required it to show it had land use authorization for its entire project, in adding a new requirement to Section 72-12-3(E). We disagree.

**{53}** Aquifer Science relies on finding of fact No. 30 and conclusions of law Nos. 26 and 31 to make its point. Finding of fact No. 30 merely—and accurately—notes that Village 1 was not annexed by Edgewood, and is under the jurisdiction of Bernalillo County—which has not annexed Village 1 and has not approved the Master Plan. Conclusion of law No. 26 notes that Bernalillo County's approval of the Master Plan and annexation of Village 1 is uncertain. This conclusion is reasonable given that Bernalillo County was—and is—an active protestant in this matter. Conclusion of law No. 31 states, "Also, Absent [sic] inclusion of Village 1 in the Master Plan, [Aquifer Science]'s calculation of groundwater usage is not accurate and the generation of effluent to mitigate/offset the impact the Master Plan will have on San Pedro Creek is flawed."

**{54}** These portions of the district court's decision simply do not carry the meaning or the weight Aquifer Science ascribes to them. Finding of fact No. 30 and conclusion of law No. 26 are simple observations describing the factual circumstance in this case. Conclusion of law No. 31 is most accurately interpreted as an expression of one factor among others impinging on the district court's consideration of the issues of the amount of water likely to be used under the Application and the impairment potentially caused by that use. The district court did not require land use approval as a precondition to approval of the Application. It simply noted the uncertainties evident in the execution of the Master Plan. In the district court's view, those uncertainties weighed in favor of caution in deciding whether to approve the Application because they all increase the risk that the Master Plan would require use of more pumped water than contemplated and the production of less effluent than contemplated in its projections. Thus, the district court's observations with regard to land use approvals are best seen as common sense factors to be taken into account as part of the overall scenario of potential water usage and not as strict requirements for approval of the Application. This interpretation of the district court's decision is in keeping with the precept that appellate courts indulge all inferences in support of the decision below and disregard all inferences to the contrary. *See Sheldon v. Hartford Ins. Co.*, 2008-NMCA-098, ¶ 7, 144 N.M. 562, 189 P.3d 695.

## II. Costs

**{55}** Generally, "costs, other than attorney fees, shall be allowed to the prevailing party unless the court otherwise directs." Rule 1-054(D)(1). As the prevailing party, Protestants are "entitled to a presumption that [they] should be awarded costs." *See Key v. Chrysler Motors Co.*, 2000-NMSC-010, ¶ 6, 128 N.M. 739, 998 P.2d 575. The burden is on the losing party to demonstrate that an award of costs would be unjust or that other circumstances justify a denial or reductions of costs. *Apodaca v. AAA Gas. Co.*, 2003-NMCA-085, ¶ 103, 134 N.M. 77, 73 P.3d 215.

**{56}** Aquifer Science argues (1) Protestants' bill of costs was deficient because Rule 1-054(D)(4) requires a party to disclose sufficient information for the district court to

determine if each itemized cost is recoverable, and asserts that Protestants failed to do so; (2) Aquifer Science was entitled to additional time to lodge specific objections based on additional information Protestants provided to the district court and Aquifer Science; and (3) NMSA 1978, Section 56-8-4(A) (2004) does not permit an award of post-judgment interest on an award of costs. We address each argument in turn after we detail the factual and procedural background of the issue.

{57}    The timeline of submissions, objections, and communications between the parties about the bill of costs is useful to understand the district court's rulings. Protestants initially filed a bill of costs on August 28, before the district court entered its final judgment. On September 3, Aquifer Science contacted Protestants and requested that Protestants provide supporting documentation. Protestants responded that same day by providing electronic versions of invoices for expert witnesses referenced in their original bill of costs. On that same day, the district court filed its final judgment. The next day Aquifer Science requested a complete set of invoices and documents supporting payment of invoices. On September 5, Protestants refiled their bill of costs and electronically provided Aquifer Science the additional invoices it had requested. On September 11, Protestants provided Aquifer Science copies of cashed checks reflecting payment of the invoices.

{58}    On September 17, Aquifer Science timely objected to Protestants' bill of costs after receiving the documents it had requested. On September 23, Protestants sent a letter to the district court in which it provided a hard copy version of the documents it provided to Aquifer Science (Binder #2). Protestants provided the hard copy to Aquifer Science three weeks later. The delay in delivering the hard copy to Aquifer Science was caused by a clerical error internal to Protestants' counsel's office. On September 27, Aquifer Science moved the district court to disregard the documents in Binder #2 because they were not filed contemporaneously with Protestants' bill of costs and, thus, were not part of the official court record. In the alternative, Aquifer Science asked for permission to file supplemental objections.

{59}    Three months later, the district court held a hearing on the bill of costs, Aquifer Science's objections, and the motion to disregard Binder #2. During the hearing, Aquifer Science requested an extension of time to respond to the documents in Binder #2 once it was orally informed the district court would deny its motion to disregard the documents. In two written orders, the district court denied Aquifer Science's motion to disregard, substantially granted the costs requested by Protestants, and granted post-judgment interest on the award of costs.

## A.    Protestants Were Not Required to Provide More Information in Their Bill of Costs

{60}    Aquifer Science argues that "Protestants' generic bill of costs, filed without any supporting documentation," was not sufficiently detailed to meet their burden under Rule 1-054(D)(4). Our review is de novo. *See H-B-S P'ship v. Aircoa Hosp. Servs., Inc.*,

2008-NMCA-013, ¶ 5, 143 N.M. 404, 176 P.3d 1136 ("Our review is de novo because the interpretation of rules is a question of law.").

**{61}** When interpreting procedural rules, we seek "to determine the underlying intent" of our Supreme Court. *State v. Miller*, 2008-NMCA-048, ¶ 11, 143 N.M. 777, 182 P.3d 158. "In interpreting procedural rules, we apply the same canons of construction as applied to statutes and, therefore, interpret the rules in accordance with their plain meaning." *Rodriguez ex rel. Rodarte v. Sanchez*, 2019-NMCA-065, ¶ 12, 451 P.3d 105 (internal quotation marks and citation omitted). "We first look to the language of the rule, and if the rule is unambiguous, we give effect to its language and refrain from further interpretation." *Id.* (alteration, internal quotation marks, and citation omitted). Moreover, we consider all parts of the rule together, reading the rule in its entirety and construing each part in connection with every other part to produce a harmonious whole. *See N.M. Dep't of Game & Fish v. Rawlings*, 2019-NMCA-018, ¶ 6, 436 P.3d 741.

**{62}** Rule 1-054(D)(4) states, "[T]he party recovering costs shall file with the clerk of the district court an itemized cost bill, with proof of service, on opposing counsel." The rule requires the prevailing party's bill of costs be "itemized," but does not provide a definition of the term. Aquifer Science asks us to read into the plain language of the rule a requirement to provide as part of the initial bill of costs supporting documents such as invoices and cashed checks. But nothing in Rule 1-054 points to a requirement to provide documentation at that level of detail initially. *Cf. High Ridge Hinkle Joint Venture v. City of Albuquerque*, 1998-NMSC-050, ¶ 5, 126 N.M. 413, 970 P.2d 599 (noting appellate courts "will not read into a statute or ordinance language which is not there, particularly if it makes sense as written" (internal quotation marks and citation omitted)); *see also Sims v. Sims*, 1996-NMSC-078, ¶ 17, 122 N.M. 618, 930 P.2d 153 ("The plain meaning rule of statutory construction states that when a statute contains language which is clear and unambiguous, we must give effect to that language and refrain from further statutory interpretation." (alteration, internal quotation marks, and citation omitted)).

**{63}** Aquifer Science argues that because Rule 1-054(D)(4) requires that "the clerk of the district court shall tax the claimed costs[,] which are allowable by law[, and t]he judge shall settle any objections filed," the prevailing party's itemized list must provide sufficient detail so that the district court may "discern an appropriate basis under Rule 1-054(D)(2)." We agree that the rule's requirement of an itemized list is intended to provide the district court a basis upon which to discern which costs are recoverable—or not—under Rule 1-054(D)(2) and (3). It does not necessarily follow, however, that the "itemized" list must include the level of detail described by Aquifer Science. The rule provides a process to object to items and to litigate the applicability of Rule 1-052(D)(2) and (3). That process is sufficient to provide greater detail to the district court if need be. As the district court noted, Protestants' bill of costs provided a spreadsheet that included the date, source, amount, description, and recoverable cost category for each item of cost requested as provided by Rule 1-054(D)(2). We agree with the district court that the spreadsheet satisfied Protestants' initial burden to provide an itemized list sufficient for Aquifer Science to make objections.

**{64}** Aquifer Science also cites out of state and nonprecedential authority for the proposition that a generic bill of costs without supporting documentation is insufficient and does not meet Protestants' burden. These cases are not persuasive because they involve distinguishable facts or statutory requirements, or both. For example, *Allen v. Santee Community School*, No. 4:07CV3131, 2009 WL 1606478, at *1 (D. Neb. June 4, 2009), relies on a local rule of the Nebraska federal district court that specifically requires that "[c]opies of invoices or proofs of payment must be attached to the bill of costs." (omission, internal quotation marks, and citation omitted). There is simply no such rule in New Mexico's rules. *See SP Techs, LLC v. Garmin Int'l, Inc.*, No. 08 CV 3248, 2014 WL 300987, at *2 (N.D. Ill. Jan. 10, 2014) (holding that although fees for private process servers are taxable if the rates charged do not exceed those charged by the U.S. Marshals, because the invoices provided did not include any information about the hourly charge, the actual time spent serving process, or any information regarding travel and expenses, the court could not determine if the amount requested was taxable and thus only awarded the minimum charge of the U.S. Marshals). Neither of these cases, nor any other cited by Aquifer Science, support Aquifer Science's assertion that Rule 1-054(D)(4) requires submission of invoices and checks as part of an initial bill of costs submission.

## B.     Aquifer Science Was Not Entitled to Additional Time to File Objections

**{65}** Aquifer Science next argues that the district court abused its discretion in denying its request for extra time to file objections based on information in Binder #2. Aquifer Science's argument is based on its assumption that Protestants' filed bill of costs was not sufficiently detailed combined with the circumstance that Binder #2 was not provided to the district court until after its objections to the bill of costs were due. Aquifer Science contends that because the hard copy was not part of the official court record, it could not sufficiently object, and it was entitled to additional time to object to Protestants' bill of costs.

**{66}** We review the district court's decisions regarding costs for an abuse of discretion. *Robertson v. Carmel Builders Real Estate*, 2004-NMCA-056, ¶¶ 48, 53, 135 N.M. 641, 92 P.3d 653; *State v. Antonio M.*, 2022-NMCA-041, ¶ 23, 516 P.3d 193 ("We review a district court's decision to deny or grant a continuance or extension under an abuse of discretion standard."), *cert. granted* (No. S-1-SC-39343, Aug. 11, 2022).

**{67}** We conclude that the district court did not abuse its discretion in granting Protestants' bill of costs and denying Aquifer Science's request for an extension of time to supplement its objections. The district court's order first concluded that Protestants' bill of costs—specifically Exhibit B—was not deficient and satisfied their burden under Rule 1-054(D). The district court thus foretold our ruling here. The district court noted that the supporting documents Aquifer Science requested were provided electronically as soon as they were requested and before Aquifer Science was required to provide its objections. The district court also noted that Aquifer Science alluded to the electronically provided documents. The district court further noted that Aquifer Science was provided Binder #2 two months before the hearing. While Aquifer Science complains that the

hard copies provided in Binder #2 contained handwritten additions to the invoices, it does not explain how those handwritten notes affected its ability to object to Protestants' bill of costs or if they changed the calculations provided.

**{68}** The order thus demonstrates that the district court was fully aware of the information Aquifer Science had available to it. In our view, the district court's decision reflects a common sense, practical conclusion that Aquifer Science had all of the information it needed in sufficient time to review and make all of the objections it deemed meet. The district court's denial of Aquifer Science's request for an extension was therefore not contrary to logic or reason. *See Stansell v. N.M. Lottery*, 2009-NMCA-062, ¶ 14, 146 N.M. 417, 211 P.3d 214 ("A [district] court abuses its discretion when its decision is contrary to logic and reason." (internal quotation marks and citation omitted)).

**C.      Prevailing Parties Are Entitled to Post-Judgment Interest on an Award of Costs**

**{69}** Aquifer Science argues that the district erred as a matter of law when it granted post-judgment interest pursuant to Section 56-8-4(A) on the cost award. We generally review an award of post-judgment interest for abuse of discretion. *Pub. Serv. Co. of N.M. v. Diamond D Constr. Co.*, 2001-NMCA-082, ¶ 60, 131 N.M. 100, 33 P.3d 651. To the extent we must interpret our statutes, our review is de novo. *See H-B-S P'ship*, 2008-NMCA-013, ¶ 5.

**{70}** The relevant statute provides that "[i]nterest shall be allowed on judgments and decrees for the payment of money from entry and shall be calculated at the rate of eight and three-fourths percent per year." Section 56-8-4(A). Aquifer Science argues that an award of costs is neither a judgment nor a decree, and, as such, Protestants were not entitled to post-judgment interest on their award of costs.

**{71}** The general rule regarding interest on costs is that "in the absence of a statutory authorization, interest may not be allowed on a judgment awarding . . . costs." 47 C.J.S. *Interest & Usury* § 69 (2022). Interestingly, there is no New Mexico case authority squarely considering whether Section 56-8-4(A) allows interest to be imposed on cost awards.[3] Aquifer Science relies on our Supreme Court's decision in *Genuine Parts Co. v. Garcia*, 1978-NMSC-059, 92 N.M. 57, 582 P.2d 1270, for the proposition that interest is not allowed on costs, but acknowledges that the discussion in *Garcia* is based "on the unstated premise that interest is not allowed on costs." The opinion in *Garcia* neither mentions Section 56-8-4(A), then compiled as NMSA 1953, Section 50-6-3 (Vol. 8, Repl., Part 1, 1953), nor undertakes any statutory analysis. *Garcia*, 1978-NMSC-059. In fact the opinion does not even mention the "general rule" reflected in 47 C.J.S. *Interest & Usury* § 69, quoted above.

---

3Though Section 56-8-4 has been amended a few times, the historical statute has provided that "judgments and the decrees for the payment of money" are subject to post-judgment interest since 1852 in territorial times. 1865 Compiled Laws of N.M., ch. 79 § 5 (1852).

**{72}** The issue in *Garcia* was whether interest was properly awarded on an award of attorney fees granted to a worker under the Worker's Compensation Act (WCA) in effect at that time. 1978-NMSC-059, ¶¶ 1, 18-21. The defendants argued that the award of attorney fees was an award of costs, not damages, and as such were not subject to interest. *Id.* ¶ 18. The operative provision of the WCA was NMSA 1953, Section 59-10-23(D) (Vol. 9, 2d. Repl., Part 1, 1974), which provided that after a trial attorney fees "fixed and allowed by the court shall be paid by the employer in addition to the compensation allowed the claimant under the provisions of the [WCA]." *See Garcia*, 1978-NMSC-059, ¶ 19 (internal quotation marks and citation omitted). Our Supreme Court decided that the statute required attorney fees to be "compensation and not taxed as costs." *Id.* ¶ 20. Because the attorney fees were included as part of the compensation award they were to be "considered part of the judgment and interest thereon is proper." *Id.* Given that our Supreme Court never mentioned NMSA 1953, Section 50-6-3 (1953) (recompiled as Section 56-8-4(A)), *Garcia* does not resolve the issue squarely presented to us. *See Fernandez v. Farmers Ins. Co. of Ariz.*, 1993-NMSC-035, ¶ 15, 115 N.M. 622, 857 P.2d 22 ("The general rule is that cases are not authority for propositions not considered." (internal quotation marks and citation omitted)). We thus turn our attention to Section 56-8-4(A).

**{73}** Section 56-8-4(A) provides for interest on "judgments and decrees for the payment of money." Is this the statutory authorization in New Mexico that addresses the exception to the general rule that costs are not subject to interest? We conclude that it is.

**{74}** We base our conclusion on the straightforward observation that an award of costs—and its accompanying order to pay them—are obviously judgments for the payment of money. In using the word "obviously" we echo the general approach of the federal courts in granting interest on costs pursuant to 28 U.S.C. § 1961. *See Wheeler v. John Deere Co.*, 986 F.2d 413, 415 (10th Cir. 1993) (noting that "[a]n award of costs, which partially reimburses the prevailing party for the out-of-pocket expenses of litigation, is obviously 'any money judgment[]'" under 28 U.S.C. § 1961). Section 1961 provides, "Interest shall be allowed on any money judgment in a civil case recovered in a district court." This language is the functional equivalent of Section 56-8-4(A)'s provision that "[i]nterest shall be allowed on judgments and decrees for the payment of money."

**{75}** The Tenth Circuit's pragmatic view of the nature and status of costs in turn echoes the Iowa Supreme Court's view of the issue going back to 1897. In *Hoyt v. Beach*, 73 N.W. 492, 493 (Iowa 1897), construing substantially identical language to Section 56-8-4(A), the Court stated:

> Money due on a judgment for costs is as much money due on a judgment as is money due on a judgment for damages, and this is true whether such costs embrace the fees of witnesses or officers or attorney[] fees. While we think it has been the understanding that costs did not draw interest, still we discover nothing in our statute allowing interest on

judgments which limits its allowance to the judgment for damages only. There was therefore no error in providing that the costs and attorney[] fees should draw interest.

*See Arnold v. Arnold*, 140 N.W.2d 874 (Iowa 1966), *superseded by statute on other grounds as stated in In re Marriage of Baculis*, 430 N.W.2d 399 (Iowa 1988); *see also Ezzone v. Riccardi*, 525 N.W.2d 388, 401 (Iowa 1994), *as amended on denial of reh'g* (Dec. 15, 1994) (same); *Cajun Elec. Power Coop., Inc. v. Owens-Corning Fiberglas Corp.*, 605 So. 2d 1387, 1389 (La. Ct. App. 1992) (determining that "since court costs are considered by law to be money judgments executable against the party that costs are assessed against . . . and since [the statute] does not differentiate between expenses incurred by a party and taxed as costs and a judgment for other court costs, the award of legal interest on court costs is permissible"), *writ granted*, 609 So. 2d 213 (La. 1992), *and aff'd in part and amended sub nom. Cajun Elec. Power Co-op. v. Owens-Corning Fiberglass Corp.*, 616 So. 2d 645 (La. 1993).

**{76}** To the extent Aquifer Science cites cases from other jurisdictions, they are either simply inapplicable or they interpret statutes that do not allow interest on costs. *See, e.g.*, *Eberhardt v. Eberhardt*, 2003 ND 199, ¶¶ 12-14, 672 N.W.2d 659 (noting that the mother was not entitled to an award of interest on attorney fees because the statute only provided for interest on spousal support or child support, and the mother had not taken enforcement steps in accordance with the statute); *Schwartz v. Kunze*, 22 P.3d 618, 622-23 (Kan. Ct. App. 2001) (regarding statutes relating to the costs of repairs and erecting a fence, determining that because the relevant party was not entitled to costs relating to the fence because of failures to follow procedural requirements, it was not entitled to attorney fees, and since it was not entitled to the attorney fees, it was not entitled to the interests on the attorney fees); *Catlin v. Tormey Bewley Corp.*, 219 P.3d 407, 412 (Colo. App. 2009) (holding that accrued interest on loans taken out by prevailing parties to finance their cases is not a recoverable cost and noting that based on its statute, which permits interest on damages, "Colorado awards moratory interest on costs only in rare circumstances—not present here—where the costs constitute an item of special damages").

**{77}** In awarding costs, the district court ruled Protestants were entitled to payment from Aquifer Science pursuant to Rule 1-054(D), and in doing so issued a judgment for the payment of money. As our Legislature has provided that a judgment for a payment of money is subject to an award of interest, we affirm the district court.

**CONCLUSION**

**{78}** For the foregoing reasons, we affirm.

**{79} IT IS SO ORDERED.**

**MICHAEL D. BUSTAMANTE, Judge,
retired, sitting by designation**

**WE CONCUR:**

**J. MILES HANISEE, Chief Judge**

**JENNIFER L. ATTREP, Judge**